UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

_____

UNITED STATES OF AMERICA            )
                                    )
                                    )
vs.                                 )   CASE NO. 3:10-00250
                                    )
                                    )
MATTHEW PAUL DEHART                 )

_____

TRANSCRIPT OF PROCEEDINGS

_____

BEFORE:                    THE HONORABLE ALETA A. TRAUGER

DATE:                      DECEMBER 3, 2010

TIME:                      3:45 P.M.

_____

APPEARANCES:

FOR THE GOVERNMENT:        MATTHEW EVERITT
                           U.S. Attorney's Office
                           Nashville, Tennessee

FOR THE DEFENDANT:         RON SMALL
                           Federal Defender's Office
                           Nashville, Tennessee

_____

REPORTED BY:               BEVERLY E. "BECKY" COLE, RPR
                           OFFICIAL COURT REPORTER
                           A-837 U.S. COURTHOUSE
                           NASHVILLE, TN  37203
                           (615) 726-4893
                           BECKY_COLE@TNMD.USCOURTS.GOV

1                          **WITNESS INDEX**

2

3

4    **PAUL JOSEPH DEHART:**

5    **Direct Examination by Mr. Small**                      **5**

6    **Cross-Examination by Mr. Everitt**                     **25**

7    **Redirect Examination by Mr. Small**                    **37**

8

9    **LEANN DEHART:**

10   **Direct Examination by Mr. Small**                      **39**

11   **Cross-Examination by Mr. Everitt**                     **46**

12   **Redirect Examination by Mr. Small**                    **48**

13

14

15                            **EXHIBITS**

16

17   **Defendant's Exhibit 1**                                **18**

18   **Defendant's Exhibit 2**                                **25**

19

20

21

22

23

24

25

```
 1              THE COURT:  Good afternoon.  We are here on
 2   United States versus Matthew Paul -- is it Dehart?
 3              MR. DEHART:  Yes, ma'am.
 4              THE COURT:  We have for the government Matthew
 5   Everitt -- and, Mr. Everitt, I want to thank you for filling
 6   in here; I just didn't see I could postpone this for as many
 7   weeks as Ms. Daughtrey wanted me to postpone it for -- and
 8   for the Defendant, Ron Small.
 9              MR. SMALL:  Yes, ma'am.
10              THE COURT:  And Mr. Dehart is in the courtroom.
11   We are here on a review of a detention decision of a
12   magistrate judge in Maine.
13        The government has filed an extensive document that
14   has the transcript of the hearing in Maine.  I have
15   requested from the probation office the pretrial services
16   report, which I trust you all got copies of?
17              MR. SMALL:  Yes, ma'am.
18              THE COURT:  And then I realized when I was
19   reading the government's position that there was a reference
20   to Exhibit 2 which was not attached or filed.  I have just
21   been furnished that, and I trust you have been furnished
22   that?
23              MR. SMALL:  I have.  Mr. Everitt provided that
24   to me.
25              THE COURT:  And I have almost finished looking
```

1   at it.

2           MR. EVERITT:  Your Honor, just for the record, I

3   didn't file that on PACER, and I put a parenthetical in our

4   notice.  The reason was it contained unsworn statements of

5   law enforcement, and it was admitted over objection of

6   counsel at the first detention hearing.

7           THE COURT:  Okay.

8           MR. EVERITT:  And it was 6:30 the night before,

9   so I couldn't call Ron to see if he had a problem with it.

10  When I got the nervous feeling, I figured it better not to

11  put it on PACER.

12          THE COURT:  That's fine.  All right.  The

13  presumption applies here, so I guess, Mr. Small, do you want

14  to go forward?

15          MR. SMALL:  Yes, Your Honor.

16          THE COURT:  All right.

17          MR. SMALL:  I would like to call Mr. Paul

18  Dehart.

19          THE COURT:  All right.  Paul Dehart?

20          THE CLERK:  Raise your right hand.

21          (WITNESS WAS SWORN.)

22          THE CLERK:  State your name for the record.

23          THE WITNESS:  Paul Joseph DeHart.

24          THE CLERK:  Take a seat in the witness stand.

25                  PAUL JOSEPH DEHART,

1          having first been duly sworn,

2        was examined and testified as follows:

3                DIRECT EXAMINATION

4    BY MR. SMALL:

5    Q      Mr. Dehart, where do you presently live?

6    A      We live in Newburgh, Indiana, 10270 Bourbon Street.

7    Q      And you live there with your wife?

8    A      Yes, Leann.

9    Q      What's her name?

10   A      Leann Dehart.

11   Q      How long have you and your wife lived at that

12   residence?

13   A      We've lived there since 2005.

14   Q      You are Matthew Dehart's father?

15   A      Yes, sir.

16   Q      Did Matthew at any time live with you at that

17   residence, sir?

18   A      Yes, he lived with us during 2005 until just

19   recently.

20   Q      All right.  Now, Mr. Dehart, are you aware of the

21   circumstances surrounding this case against your son?

22   A      Yes, sir.

23   Q      All right.  What I want to direct your attention to,

24   sir, is the -- was an arrest warrant or search warrant

25   executed at your home in 2010?

```
1   A      Yes, sir.

2   Q      And what date was that?

3   A      That was Monday, January 25th.

4   Q      At that time was your son present?

5   A      Yes. he was.

6   Q      Were you or your wife present?

7   A      No, we were not.

8   Q      Where were you folks?

9   A      My wife, Leann, was at her work.  She works at

10  Trinity Seminary, Newburgh.  And I was at the Newburgh

11  church where I work.

12  Q      What do you do at the church there, sir?

13  A      I'm a minister.

14  Q      How long have you been a minister at the Newburg

15  Church?

16  A      For five years.

17  Q      Now, when did you learn about the warrant, search

18  warrant?

19  A      Shortly after the team of investigators left, Matt

20  called me and asked me to come home.

21  Q      And did you immediately arrive to the residence?  How

22  long did it take you to get there?

23  A      Fifteen minutes.

24  Q      What did you learn about the warrant when you got

25  there?
```

1    A       I read the warrant, what it was for, seizure of

2    electronic equipment, and I believe it referenced what the

3    charges were or what they were investigating.

4    Q       All right.  Subsequent to the warrant being executed,

5    I imagine, was Matt arrested?

6    A       No, he was not.

7    Q       Was any instructions, to your knowledge, given to

8    your son about staying in the jurisdiction or reporting to

9    law enforcement officers or anything like that?

10   A       No, sir.  All we had was a copy of the warrant, the

11   -- yeah, the search warrant.  That's all we had.

12   Q       Now, after that warrant was executed at your

13   residence, what, if anything, did Matt do or what happened

14   with regard to Matt after that point?

15   A       He was very upset, as we were.  He was -- he didn't

16   sleep the night that it happened.  And the next morning, he

17   decided to drive to -- to leave to clear his head.  He was

18   sort of in a state of shock, and so he took off for a couple

19   of days.

20   Q       Where did he go?

21   A       He ended up going to Mexico.

22   Q       Now, was there any discussion between you and your

23   son about why he was going to Mexico or, you know, any

24   reasons why he would go there to clear his head versus the

25   continental U.S.?

```
1   A       Well, I didn't think it was unusual going to Mexico.
2   We -- my wife and I have been to Mexico for mission trips.
3   I have gone a couple of times over the past few years.  I
4   think he didn't feel safe -- I know he didn't feel safe at
5   our house, and he just needed to get away.
6   Q       Now, did you provide transportation to your son in
7   order for him to go to Mexico?
8   A       He took our 1997 Saturn.  It was the vehicle that he
9   used when he needed to use it, and so that was -- that
10  vehicle was available to him.
11  Q       Now, you said you went on mission trips, you and your
12  wife, before?
13  A       We have been to Monterrey, Mexico, when we were in
14  college, and currently our church sponsors a mission church
15  in Baja, Mexico, and I've been there three times.
16  Q       Has your son, to your knowledge, ever been to Mexico
17  prior to January of 2010?
18  A       No, he hadn't.
19  Q       Was there -- where was he staying or do you know
20  where he was staying when he went to Mexico?
21  A       He stayed at a hotel near the airport, and I can't
22  remember the name.
23  Q       Did you provide him any money or funds to travel --
24  other than the car to travel to Mexico or to stay at some
25  hotel down there?
```

1  A      No, we did not.

2  Q      Do you have any family or friends down there that

3  your son could contact or did contact while he was there?

4  A      We knew a preacher at a church in Monterrey, but I

5  don't know whether Matt contacted him or not.

6  Q      Were you in any contact by phone with your son or

7  otherwise while he was in Mexico?

8  A      Yes.

9  Q      When?

10 A      He had -- he called us as he was on his way down

11 there.  And then when he was there, he had the capability to

12 pick up a small notebook and set up a Skype account so he

13 could Skype us, so he talked to us at night.

14 Q      How often did you and your wife and Matt Skype?

15 A      He called every day.

16 Q      Did you at any time ever encourage him to come back

17 to the United States or did you have any discussions about

18 that?

19 A      Yes, we did.  As he had time to think about it and

20 clear his head, we talked him into coming back, and he came

21 back on Sunday, the Sunday after the warrant.

22 Q      He came back to Indiana on that date or to the United

23 States?

24 A      He crossed back in the United States on the Saturday

25 and then went to San Antonio, stayed overnight in San

1    Antonio, then flew back from San Antonio to Evansville,

2    where we picked him up.

3    Q        What happened to the car?

4    A        The car is -- it was left in Mexico.

5    Q        Why was it left in Mexico?

6    A        It was an old car, had been totaled in a tornado in

7    2005; for insurance purposes, it wasn't worth much.

8    Mechanically, we were unsure about it making its way back,

9    and apparently Matt missed a checkpoint that he was supposed

10   to stop and register, get some insurance for Mexico, so we

11   were concerned about that, and we just wanted him to come

12   back home.  So he took a limo to the border, walked across

13   the border, then took a taxi to San Antonio.

14   Q        Did you all pay for his flight back?

15   A        No, he had money to do that.

16   Q        During the time that Matt was -- your son was in

17   Mexico, during those days, did you ever get contacted

18   yourself by a law enforcement officer asking where Matt was?

19   A        No, we did not.  As far as we know, he wasn't under

20   any travel restrictions.

21   Q        Now, when he came back to your home what happened at

22   that point, what did you do?

23   A        He was at home with us and started taking him to --

24   he sees a counselor, and took him to his counselor to deal

25   with the enormity of the situation.

Q    Was he depressed at that point?

A    He was, yes.

Q    How often did he go to see a counselor?

A    He saw a psychiatrist once a month for -- once every
six weeks or month for medication management.  Then he saw a
psychologist every other week, I think it was.

Q    Now, I think you said you lived in your home for a
period of time.  How long have you lived in the state of
Indiana?

A    We moved to state of Indiana in May of 2005, rented
an apartment, then we bought our condo in September of 2005.

Q    Did you -- I guess, what brought you to Indiana?  Did
you serve in the military or what happened?

A    I had never served in the military in Indiana.  I had
been retired from the Air Force.  My mother-in-law, Leann's
mom, lives in Fort Branch, and she retired there.  And there
was a church position opened at Newburgh, so I interviewed
for that position and took that position.

Q    How far does Matthew's grandmother live from you
folks?

A    Approximately 30 miles north.

Q    Now, at any time did your son apply for a passport
after he got back to the states?

A    He did, applied for a passport in March of 2010, this
year, this year.

1    Q      And what was the purpose for him applying for a

2    passport?

3    A      We were investigating after talking with his

4    counselor that he needed something to change his mind-set

5    and what he was thinking about because this was all that he

6    had to think about.

7          We looked into enrolling him in a language school and

8    then in college in Canada, and so in order to do that he

9    needed to have a passport, and so he applied for a passport.

10   Q      Backing up a little bit about your son, did your son

11   ever serve in the armed forces?

12   A      He did.  He enlisted in the Air National Guard in

13   February of 2008.

14   Q      And how long did he serve?

15   A      He was discharged after 14 months, or 16, just over a

16   year.

17   Q      What was the basis for the discharge?

18   A      He had to have a top secret security clearance in the

19   course of the investigation for the SCI, the sensitive

20   compartment, did information clearance.  They do an

21   extensive background investigation.

22         He was granted a clearance, but they were concerned

23   about the history of depression in my family on my mom's

24   side.  So since the unit works with unmanned aerial

25   vehicles, and they are concerned about post-traumatic

1   stress, they thought that depression may be a problem for

2   him chronically, so they gave him an entry level separation.

3   Q      Was that ultimately classified as an honorable

4   discharge?

5   A      That's the certificate they gave him, yes, sir.

6   Q      All right.  If I could show you a document,

7   Mr. Dehart, and ask you to take a look at it.

8          Do you recognize that, sir?

9   A      Yes, sir.

10  Q      What is it?

11  A      This is the National Guard discharge certificate Matt

12  received.

13  Q      All right.  I offer that, Your Honor, as Defendant's

14  Exhibit 1?

15              THE COURT:  All right.  Any objection?

16              MR. EVERITT:  No, ma'am.

17              THE COURT:  All right.

18              (Defendant's Exhibit 1 was received into

19  evidence.)

20  BY MR. SMALL:

21  Q      Now, you had mentioned something about -- well, maybe

22  you mentioned, I'll just ask you again, was there some

23  attempt to get Matthew enrolled in school out of the

24  country?

25  A      Yes.

1  Q      All right.  And when was that?

2  A      In March, the end of March, early April, he enrolled

3  in a French language class in Montreal, Canada.

4  Q      Was there any reason why you wanted him to or he

5  discussed, I guess, enrolling in a class in Montreal versus

6  say Monterrey, California?

7  A      Well, the cost was reasonable.  A lot of language --

8  lot of people came to that school to learn English and to

9  learn French.

10          As soon as he was able to enroll in the class, he was

11  able to pick up insurance, which he did not have in the

12  United States.  He was denied health insurance for a

13  preexisting condition of depression, and so he was

14  ineligible for health insurance.

15  Q      Did he -- what course of study did your son

16  ultimately enroll in, in Canada?

17  A      While he was at the language course, investigated

18  other programs, and there was a community college equivalent

19  on Prince Edward Island called Holland College.  They offer

20  two year occupational degrees.  And he enrolled in a welding

21  program, which was to begin in September of this year.

22  Q      Did you pay the tuition?

23  A      Yes, we paid the tuition in full for this year.

24  Q      And how long was the language school before he --

25  A      The first part of the course was for eight weeks.

1  Then he was going to determine whether he wants to continue

2  for another eight, and he did not.  And so we got him set up

3  in Prince Edward Island in preparation for school.

4  Q      Now, did you and your wife take him up there?

5  A      We did.

6  Q      And when did y'all take Matthew to school?

7  A      We took him to the language school the end of April.

8  We went to New York state, and Matt took a bus to Montreal

9  and stayed with a host family.

10       Then when he completed the language school, we went

11  from Newburg to Montreal, picked him up, stayed in Montreal

12  two days, looked around, and then drove through New

13  Brunswick to Prince Edward Island, vacationed for two weeks

14  there and while during that time set him up with an

15  apartment and paid his tuition and got him enrolled in the

16  class.

17  Q      To your knowledge, sir, from January when the warrant

18  was first served on your home to the point which you took

19  Matthew to school, had you been contacted by law enforcement

20  at all about his whereabouts or him coming in to talk to

21  them?

22  A      An investigator from Vanderburgh County Sheriff's

23  Department -- I don't remember the officer's name -- who

24  Matt said had executed the warrant and handcuffed Matt when

25  he came into our house came back in -- sometime later in

1  March, I don't remember the exact date; met me in the

2  parking lot; inquired as to how Matt was doing with his

3  counseling; and said he was concerned for Matt and his

4  counseling.

5       I said he was fine.  I thanked him very much.  Then

6  my wife and I went into the condo.

7       He knocked on the door after we had gotten in and

8  said that he had some of the seized material he wanted to

9  return, and I said that if you would, please, contact the

10 lawyer, and he could give it to him, but he said nothing

11 about anything beyond that.

12 Q    He didn't ask where Matt was?

13 A    No, he did not ask me that.

14 Q    So after you enrolled your son in school in Canada,

15 what did you do next?

16 A    We came back home on July the 1st or 2nd and drove

17 back to Indiana and went back to our normal routine.

18 Q    Now, did you remain in constant contact with your son

19 during the time in which he was in Canada attending school?

20 A    We did.  He set up -- he had a Skype account, and we

21 talked each night.  We said our prayers together before he

22 goes to bed.  So --

23 Q    Did you -- did the time come where you had learned

24 about your son's arrest at the border?

25 A    In -- August the 5th, Matt had to re-enter Canada,

had to leave Canada because he was there as a visitor; a
visa was not required, and he could remain up to 180 days,
but in order to begin his studies he had to have a student
visa.

So he had a student visa application for Canada, had
to leave the United States, could come back and enter into
Canada port of entry and process that.  He was to come
across the border on August 5.

He took a bus from Charlottetown PEI on Thursday.
Friday morning he was to cross over on foot at the border in
Calais, Saint Stephen border crossing.

When he crossed the border, we were supposed to hear
something from him.  He was going to call us.  We didn't
hear anything, and so we assumed that there was a problem at
the border.

Q      So what did you do in response to that when you
learned that you did not hear from your son?

A      I waited until the evening, and I called the border
service at Calais and asked if there was any problem with
Matthew.  They said that he had been detained by the U.S.
Marshals and that he was being transported to the Penobscot
County Jail in Bangor, Maine.

And I later called the Bangor jail in the evening and
found out that he had arrived there.

Q      What involvement did you have after that, if any,

1  with this case after your son was arrested?

2  A    We didn't hear anything from his arrest officially

3  other than what the border patrol told me until Monday, the

4  federal defender's office in Bangor, Maine, Assistant

5  Federal Defender Via (phonetic) called me at some time on

6  Monday, I want to think it was afternoon, to inform me that

7  Matt was arrested on a charge of possession and distribution

8  of child pornography.

9  Q    Were you asked or did you offer to come out to Maine

10 to either, you know, testify or provide some assistance?

11 A    I did.  And I don't remember if I was informed of the

12 date of the hearing in the Monday call or Tuesday when I

13 subsequently spoke with Ms. Via, but the hearing was set,

14 detention hearing, whatever it was called.  We didn't know

15 the process and how it worked, but that hearing was set for

16 Wednesday at 10 a.m.

17     And it was a 20 something hour drive, and it was

18 probably Tuesday when we knew about it.  And we had just

19 spent the resources to set Matt up in Canada, and I sent her

20 a fax memo.  I said if you think it would be helpful for us

21 to be there to testify, we would do that; otherwise, please

22 let us know and advise us what we need to do.

23 Q    Were you ever instructed to come out there?

24 A    No, we were not.

25 Q    Would you have come out there if you were so

1  instructed?

2  A    Yes, sir, we would have.

3  Q    As we're here today regarding your son's ability to

4  travel and such, does he have any passports?

5  A    No, his passport, his license were seized at the

6  border.

7  Q    All right.  Now, we talked about third party

8  custodian; you know what that is?

9  A    Yes, sir.

10 Q    Are you willing to take that responsibility for your

11 son?

12 A    Yes, we are.

13 Q    Now, one of the things is -- well, let me ask it this

14 way.  Do you have any landlines at your house?

15 A    We don't currently have a landline.  We have two cell

16 phones.

17 Q    Would you be willing, of course, to get a landline --

18 A    Yes, sir, we would.

19 Q    -- if you're required to do that?  Have you visited

20 your son frequently since he's been incarcerated at the

21 Warren County Jail?

22 A    Yes, sir.  We come down to see him every Saturday,

23 and we speak with him every day on the phone.

24 Q    Did you form an opinion about his condition at this

25 point, I guess, mental health wise?

1    A      He hasn't had to take any mental health medication.

2    We are very proud of that.  He seems to be handling things

3    well.

4          We were concerned.  We found when he was in Maine he

5    was placed in isolation and given Thorazine, for which he

6    had a seizure, but he hasn't had any problems that have come

7    up since then.  So he's been able to handle being in a pod

8    with the other inmates.

9    Q     Now, as you said, you are a pastor of a church?

10   A      Yes, sir.

11   Q     Did your son ever attend that church?

12   A      Yes, he did, regularly.

13   Q     Did you have him set up in a church home either in

14   Canada or elsewhere?

15   A      We visited the Central Christian Church in

16   Charlottetown, PEI.  My wife and I contacted some of the

17   people there and had a conversation with one of the ladies

18   and asked to kind of him take Matt under her wing, and so we

19   felt like he had a connection there.

20   Q     Has there ever been anything to your knowledge that

21   might have caused you concerns about Matt being involved

22   with children or being violent or anything like that?

23   A      No, sir.  No.  He helped out in our youth group at

24   the church.  He's been a chaperone when we take groups to

25   Winterfest in Gatlinburg, so there's never been any

1  indication of anything like that.

2  Q      How old is your son?

3  A      He's 26 years old.

4  Q      He has a high school diploma?

5  A      Yes, he does, and some college.

6  Q      Does he have any history of drug or alcohol abuse?

7  A      No, sir.

8  Q      Does he have any criminal record?

9  A      He had a problem in 8th grade with a false public

10  alarm for which he served community service.

11  Q      How much community service?

12  A      Seventy-five hours.

13  Q      Do you have -- other than your -- is it your wife's

14  mother or your mother?

15  A      My wife's mother, mother-in-law.

16  Q      Other than her, do you have any family that lives in

17  the southern part of the Indiana?

18  A      No, not currently.

19  Q      Are there any opportunities that you know of or your

20  wife knows of about job opportunities for your son if he's

21  released?

22  A      He has plenty of volunteer opportunities at the

23  church.  There's lots of older people that I could have him

24  involved in helping.

25  Q      Do you believe your son in the face of these charges

1  -- and, by the way, during the whole time that you were

2  dealing with your son between Mexico and Canada, other than

3  his arrest at the border, had law enforcement other than

4  that one time contacted you about your son looking for him?

5  A       No, sir.

6  Q       Anybody leave you any messages on your phone?

7  A       No, sir.

8  Q       Anybody leave any notes on your door saying, hey,

9  where is Matt Dehart?

10 A       No, no.

11 Q       When is the first time you learned about the charges,

12 I guess, against your son?  Was it when he was arrested

13 in --

14 A       When the federal defender in Bangor, Maine called me,

15 and then I read about it in the paper in Bangor, Maine.

16 Q       Now, are you aware of some things about the minors

17 involved in this case and threatening behavior on the part

18 of your son; are you aware of any of that?

19 A       Personally, I have no knowledge of that, subsequently

20 what we've talked about in your office, but I didn't know

21 any of that.

22 Q       Did you know since the time of the warrant being

23 executed until now whether there's been any issues of any

24 violence or any threats or any behavior on the part of your

25 son?

```
 1   A      Not that I know of, sir.
 2   Q      Are you willing to put up your home?
 3   A      Yes, sir, we are.
 4   Q      Do you have any equity in your home?
 5   A      We probably have 10, $12,000 perhaps.
 6   Q      Are you willing to do whatever it takes financially
 7   if that's what is called for --
 8   A      Yes, sir.
 9   Q      -- to secure your son's release?
10   A      Yes, sir, we are.
11   Q      Do you think your son would run in the face of these
12   charges?
13   A      I don't believe so, sir.  He's had time to have all
14   this sink in, and he wouldn't.
15   Q      Do any minor children ever frequent your home or your
16   neighborhood that you know of?
17   A      No, sir.  We live in a condo complex, and there's no
18   one in our building that's of that age.
19   Q      You live in a condo?
20   A      We do.
21   Q      Now, you said you provided some insurance for your
22   son when he went to Canada.  Is that right?
23   A      We did, yes.
24   Q      And how much did you pay for that, do you recall?
25   A      I think it was $90 for the eight weeks that he was
```

1    there for health insurance.

2    Q    Did that involve any medications that he might have

3    got for any depression or anything like that?

4    A    He had enough of those.  He didn't have to use their

5    insurance for that.

6    Q    I'm handing you another document, Mr. Dehart, and I

7    know you have already testified about it, but I would mark

8    this as Defendant's Exhibit 2.

9    A    Thank you.

10   Q    Do you recognize that?

11   A    Yes, I do.

12   Q    And what is it?

13   A    That's Matthew's honorable discharge from the Air

14   National Guard of Indiana.

15   Q    Now, along those lines, Mr. Dehart --

16             THE COURT:  Isn't that already Exhibit 1?

17             MR. SMALL:  That was the DD-214, Your Honor.

18   That's the actual certificate of his honorable discharge.

19   BY MR. SMALL:

20   Q    Did you learn whether or not the military ever took

21   any efforts to revoke your son's top secret security

22   clearance --

23   A    No, sir.

24   Q    -- as a result of any charges or anything else?

25   A    As far as I know, no, sir.

1  Q    Did you also, sir, pay to set your son up in an

2  apartment?

3  A    We did, in Charlottetown.

4  Q    That's in Canada?

5  A    In Canada, Prince Edward Island, where the school is

6  located.

7  Q    Did you always know where your son was --

8  A    Yes, we did.

9  Q    -- during the time that he was not in your home?

10 A    We knew he was set up in that apartment, yes.

11 Q    Your Honor, Defendant's Exhibit 2, we'll offer?

12          THE COURT:  Any objection?

13          MR. EVERITT:  No, ma'am.  Thank you.

14          THE COURT:  Received.

15          (Defendant's Exhibit 2 was received into

16 evidence.)

17          MR. SMALL:  Those are my questions, Mr. Dehart.

18 Thank you.  The government may have some questions.  Thank

19 you.

20          THE COURT:  Cross?

21          MR. EVERITT:  Thank you, Judge.

22                    CROSS-EXAMINATION

23 BY MR. EVERITT:

24 Q    Good afternoon, Mr. Dehart.

25 A    Good afternoon.

Q      I'm Matt Everitt.  I represent the government in this
case for today at least.

A      Yes, sir.

Q      I believe that you said you were in the military, you
were in the Air Force.  Is that right?

A      Yeah, I served in the Army enlistment, then I got a
commission in the Air Force.

Q      What was your rank at retirement, sir?

A      Captain.

Q      When you were in the Air Force what kind of jobs did
you do?

A      My primary AFSC, Air Force Specialty Code, was
signals intelligence.

Q      What does that mean, sir?

A      Intercepting and transcribing, processing foreign
signals, emanations.

Q      And you were posted at various places in the United
States domestically to do that job.  Is that right?

A      Yes, sir.

Q      Did you ever have any overseas postings?

A      I did.  I was stationed in Germany -- Hawaii was
considered overseas -- and Hawaii.

Q      And in your work, did you form any friendships with
brother officers?

A      Yes, sir.

1  Q      Do you still keep in touch with any of those men or

2  women?

3  A      I do.

4  Q      And would you consider any of them sort of close

5  friends?

6  A      Not particularly, no, sir.

7  Q      Are you and your wife in touch with anybody as a

8  friend that doesn't live in the United States?

9  A      We do keep in touch with some people in Germany.  We

10  went on a mission trip in 2008 where we taught English using

11  the Bible, and we still keep in touch via e-mail and

12  Facebook with some people in Cologne, Germany.

13  Q      Now, you said that when -- that Matthew got a

14  passport in March of 2010.  Is that right?

15  A      Yes, sir.

16  Q      He didn't have a passport when he went to Mexico.  Is

17  that right?

18  A      He had an expired passport.

19  Q      So he traveled into Mexico with an expired passport?

20  A      Yes, sir.

21  Q      Was that before or after you needed a passport to

22  cross the border out of the United States, do you know?

23  A      I really don't know, sir.

24  Q      Okay.  But on at least one occasion you know of he

25  used an expired document to leave this country?

```
1   A      I don't know whether he had to show -- what he did to

2   cross the border, I don't know what he was required or not

3   required to have or to show.  I don't know, sir.

4   Q      When he walked back across the border --

5   A      Yes, sir.

6   Q      -- did he still have just the expired passport as far

7   as you know?  He didn't have a valid passport --

8   A      No, he did not.

9   Q      -- or up-to-date passport?

10  A      No, sir, he did not.

11  Q      And this thing in Mexico happened after the search

12  warrant was executed at your home.  Is that right?

13  A      Yes, sir.  Yes, sir.

14  Q      When a warrant was executed at your home, I think you

15  said you kind of raced home to see what was going on.  Is

16  that fair?

17  A      Yes, sir, yes.

18  Q      And I think you said you read the warrant.  Is that

19  also correct?

20  A      Yes, sir.

21  Q      In reading the warrant, did you form any opinion or

22  view about why the officers were at your house?

23  A      It was apparent they were investigating what was on

24  the warrant, yes, sir.

25  Q      What did you understand to be on the warrant?
```

**A      I understood that they were looking for child pornography on whatever electronic equipment was located in our house.**

**Q      Okay.  So it's fair to say then, sir, that on or about the day that search warrant was executed, you had some basis to believe that there was something going on with child pornography or somebody -- you had some basis to believe that the officers were looking at something involving child pornography and your son.  Is that fair?**

**A      I understood that to be the allegation, yes, sir.**

**Q      Something floating around, an allegation involving child pornography?**

**A      Yes, sir.  Yes, sir.**

**Q      Now, you said that when your son went to Canada --**

**A      Yes.**

**Q      -- for the language school, I think --**

**A      Yes.**

**Q      -- that he was going to live with a host family.  Is that right?**

**A      Yes, sir, he did.**

**Q      Did the host family have any kids?**

**A      No, it was a grandmother.**

**Q      Did you check into that before you sent him to go live with the host family?**

**A      Yes, sir, we did.**

Q      Why was that a concern?

A      Just wouldn't have looked good if he was with a
family that had children.

Q      So you were concerned about -- given these sort of
allegations that were floating around, you were concerned
about sending him to live in a home that might have kids?

A      That was not my concern.  My concern would be any
ammunition that someone --

Q      The officers --

A      Yes, sir, that someone might use.

Q      Do you have any information about online alter-egos
or personas that your son may have assumed?

A      I know he played War of the World Craft.  He played
Halo, Tribes, many of the online games that young people his
age play, and they all have avatars, or whatever screen
names they play.

Q      Have you ever heard of Matthew DeMarco?

A      It doesn't sound familiar, sir.

Q      When your son was most recently living with you, were
you all in this condo that you are in now?

A      Yes, sir.

Q      Can you sort of walk me through what that place looks
like?  Is it high-rise, townhouse, what?

A      It's a quad.  There are seven buildings in the quad,
four condos to a quad, and ours is one of four in the first

1  building on the left-hand side on our street.

2  Q      So it's not like a high rise where you get in an

3  elevator and ride up to the 20th floor?

4  A      No, sir, there are outside entrances, separate

5  entrances, four condos, two story condos, to a building,

6  seven buildings.

7  Q      How many bedrooms is your condo, sir?

8  A      Three bedrooms.

9  Q      How many bathrooms?

10 A      Two and a half.

11 Q      So what are we talking about, 1,500, 2,000 square

12 feet?

13 A      1,700 square feet.

14 Q      1,700 square feet?

15 A      Yes, sir.

16 Q      Where was Matt living -- sort of sleeping, keeping

17 his stuff while he was with you?

18 A      Matt's bedroom is upstairs on the left-hand side at

19 the top of the stairs to the left.

20 Q      Did he have, as far as you know, computer equipment

21 and an internet connection in that room?

22 A      He did, yes, sir.

23 Q      And understanding you were living with your adult

24 child, not your 14 year old son, that was a long time ago --

25 A      Yes, sir.

1  Q      -- but did you have any sort of transparency about

2  what was going on in his room or what was in his room?

3  A      Well, I would go in there and help him clean it every

4  now and then, but we know what was in his room.  It's not

5  like it was locked or anything like that.

6  Q      Did -- while Matt was living with you, did he have

7  any visitors over to the house?

8  A      That's hard to -- I can't recall specifically.  He

9  didn't frequently have visitors over to the house.

10              THE COURT:  Did or did not?

11              THE WITNESS:  Did not.  Did not have.

12  BY MR. EVERITT:

13  Q      Did he ever speak with you or your wife that you know

14  of, of any relationships, friendships, romantic

15  relationships, any of that kind of stuff that he was having

16  while he was living at home with you guys?

17  A      He had a long-term friendship with a girl from New

18  Jersey.  I had pastored a church in New Jersey before, a

19  girl named Heather Kaseer (phonetic) was in school at David

20  Lipscomb University and kept an ongoing friendship.

21          I don't know what the nature of that was.  I know

22  Heather was more serious than Matt was.  And Matt kind of

23  liked Heather's older sister for a while in youth group,

24  so --

25  Q      Mr. Dehart, are you still working as a minister at

1   the church?

2   A       Yes, sir.

3   Q       Is that full-time job?

4   A       Yes, it is.

5   Q       So you are pretty much there -- I guess ministers

6   don't take Sunday off, they take Monday off?

7   A       Fridays and Saturdays are my days off.

8   Q       Fridays and Saturdays.  So Sunday through Thursday

9   you are busy with the church?

10  A       Yes, sir.

11  Q       If somebody dies and there's a funeral, you are busy

12  on Saturday or Sunday too, I guess, or a wedding?

13  A       Yes, sir.

14  Q       Weddings are better than funerals.

15  A       Yes.

16  Q       Who's around the house during those days that you are

17  at work?

18  A       There's nobody there at the house.

19  Q       Okay.  And if Matt were to come home and live with

20  you, who would be home during the day while he was around

21  the house?

22  A       If he had to remain in the house, he would be there

23  alone.

24  Q       Okay.  And so what would happen if he woke up on

25  Wednesday morning after you left and decided I'm out of

1  here, when would be the first time that you would be able to

2  figure that out?

3  A       Well, if I came home for lunch, I would know then.

4  We only have one vehicle now, the Honda CRV, and I take it

5  to work and drop my wife off at work.

6  Q       Okay.  And I take it from your testimony that your

7  wife is also working full time outside the home.  Is that

8  fair?

9  A       Yes, she does.

10 Q       When Matt went down to Mexico --

11 A       Yes, sir.

12 Q       -- what -- let me was back up.  I think you said with

13 respect to the language school and welding school, you and

14 your wife sort of helped out financially --

15 A       We got him set up, yes, sir.

16 Q       -- with those two trips?  When he went down to Mexico

17 that sounds like it was little more of a spur of the moment

18 thing, did you help financially with that trip?

19 A       No, sir.

20 Q       Except for the car?

21 A       Yes.

22 Q       Do you know where Matt got the money to make a trip

23 down to Mexico?

24 A       From his grandmother in Fort Branch.

25 Q       Okay.  Was that a -- was that one of those

grandmother's savings bonds in the shoe box or was that he

went to his grandmother and asked for cash?

A       I'm not sure how that worked, sir.

Q       So you know the money came from Matt's grandmother --

A       Yes.

Q       -- but you are not exactly shower how that all went

--

A       No, I'm not sure how that transpired.

Q       Okay.

        MR. EVERITT:  May I have just a minute, Your

Honor?

        THE COURT:  Yes.

        (Pause.)

        MR. EVERITT:  Just a few more questions, Judge.

BY MR. EVERITT:

Q       Mr. Dehart, I think you said when Mr. Small was

asking questions that after the warrant, after the search

warrant was executed --

A       Yes, sir.

Q       -- that some law enforcement came to the house one

other time maybe?

A       Yes, sir.

Q       Is that right?

A       Yes, sir.

Q       And I hadn't heard that before, so I might be asking

1  you to repeat yourself a little --

2  A       That's fine.

3  Q       -- but what exactly happened on that second time

4  officers came to the house?

5  A       I don't remember the time frame, sometime in March, I

6  think.  It was after -- before Matt left for --

7  Q       Before Canada, but after Mexico?

8  A       Before Canada.

9  Q       Okay.

10 A       And I don't remember the officer's name.  He's a very

11 tall gentleman, six-five, six-six.  We pulled up into our

12 parking lot at the condo, and he came up to the car as we

13 were getting out and asked me about how Matt was doing, I --

14 probably introduced himself and asked -- he mentioned Matt's

15 mental health problems and how his counseling was going or

16 something like that.

17        I shook his hand, and I said thank you for inquiring,

18 he's doing fine, everything is all right, and then my wife

19 and I went into the house.

20        And I don't know how long we were in there, and it

21 was a knock at the door.  I came to the door, and he was at

22 the door again, and one of these, oh, by the way, we have

23 some of your equipment and things we took to return to you.

24        And I don't remember how the conversation went from

25 there, but I was advised not to say anything to law

1   enforcement after this, and so I asked him to kindly return

2   anything that he did have to a lawyer in town, in

3   Evansville, Mr. Canada.

4   Q      Okay.  Just one second, Your Honor.  (Pause.)

5   Mr. Dehart, do you remember whether or not that tall law

6   enforcement officer asked you about where Matthew was?

7   A      I don't recall him asking that, sir.

8   Q      You don't recall making any comment about him being

9   in a safe place or anything like that?

10  A      No, I don't recall saying anything like that.

11  Q      Okay.  Your Honor, that's all I have.

12              THE COURT:  All right.

13  Q      Thank you, Mr. Dehart.

14  A      Thank you.

15              THE COURT:  All right.  Any redirect?

16                      REDIRECT EXAMINATION

17  BY MR. SMALL:

18  Q      You mentioned about a lawyer.  Did you retain a

19  lawyer, I guess?

20  A      We did.  Two days after the search warrant was

21  executed, we had no experience in how to do anything, and so

22  we just contacted a lawyer in town and retained him for just

23  advice as to what we should do.

24  Q      Okay.  I have nothing further, Judge.

25              THE COURT:  Do you know that there are

1    allegations in this case that your son drove down to

2    Nashville or Franklin and met with some minors, do you know

3    that?

4             THE WITNESS:  I heard that, yes, ma'am.

5             THE COURT:  Do you know about those trips?

6             THE WITNESS:  No.

7             THE COURT:  And how would he have been able to

8    make those trips without your knowing about it?

9             THE WITNESS:  He had access to the Saturn, and

10   we knew Heather was down here.  And he did help Heather move

11   into an apartment once she went out of student housing.  So

12   any time he would come down, if he came down here, that

13   would have been it.

14            THE COURT:  I see.  Anything else as a result of

15   my questioning?

16            MR. EVERITT:  Pardon me, Your Honor?

17            THE COURT:  Anything else as a result of my

18   questions?

19            MR. SMALL:  No, Your Honor.

20            MR. EVERITT:  No.  Thank you, Judge.

21            THE COURT:  Okay.  You may step down.  Thank

22   you, Mr. DeHart.

23       Any other witnesses?

24            MR. SMALL:  Leann Dehart, Your Honor.

25            THE COURT:  All right.

1          THE CLERK:  Raise your right hand.

2          (WITNESS WAS SWORN.)

3          THE CLERK:  State your name for the reports and

4    spell your first name.

5          THE WITNESS:  Leann Dehart.  L-E-A-N-N.

6          THE CLERK:  Take a seat in the witness stand.

7                    LEANN DEHART,

8          having first been duly sworn,

9          was examined and testified as follows:

10                   DIRECT EXAMINATION

11   BY MR. SMALL:

12   Q     Ms. Dehart, where do you work?

13   A     I work for Trinity Theological Seminary.

14   Q     Okay.  How long have you been there?

15   A     Going on six years now.

16   Q     Do you teach there?

17   A     I am the Director for Progression and Retention

18   there.

19   Q     And for the record, you are Matthew's mother?

20   A     I am.

21   Q     And I understand you served in the armed forces?

22   A     Yes, I did, sir.

23   Q     When did you get out?

24   A     I believe it was 1979.

25   Q     How long did you serve?

A       For two years.

Q       Did you encourage your son to enlist in the Air
National Guard?

A       I did, sir.

Q       Okay.  Is your son -- what character traits would you
say your son has?

A       My son is a -- he's got a great sense of humor.  He's
very kind and compassionate (witness is emotional).  I'm
having a hard time with this because this is not my son.
This is not the son I know and I live with.

        My son is a good person.  Everybody that comes around
that has anything to do with Matt says he's a kind and
good-hearted person and they like being around him.  He's
very smart, and he's very helpful.  And I'm extremely proud
of my son.

Q       Do you think that your son would ever harm anybody?

A       No, sir.

Q       We've discussed the allegations against your son, and
are you aware of those?

A       Yes, sir.

Q       Do you have any knowledge at all about any of the
circumstances including the minors that were involved in
this case?

A       No, sir.

Q       Did you become aware of the trip to Mexico that your

1  son took?

2  A      Afterwards, yes, sir.

3  Q      So were you involved in the initial discussions and

4  decisions by your son to go to Mexico?

5  A      No.

6  Q      Okay.  Who told you that he was in Mexico?

7  A      Well, my husband told me or either that or we got a

8  call that night.  It was a while back, but I knew afterwards

9  that he had taken a trip to clear his head.  I wasn't sure

10 that he was going to end up in Mexico.

11 Q      Did you ask your husband why it is that your son was

12 going to Mexico as opposed to anywhere else?

13 A      Well, I don't know that he knew either.  I mean, I'm

14 not sure that we both knew.  I mean, I think Matt just

15 decided he needed to get some time and -- away and just

16 think.  We were all pretty scared.

17        It was -- afterwards it was hard to go back home.

18 When someone breaks in your home and steals all your stuff,

19 takes your stuff, it was hard for us to even go home at

20 night.

21        We would drive around for hours and just go eat out

22 and drive around for hours before we would go home.  We felt

23 like the tornado all over again.

24 Q      Did you have discussions with your son while he was

25 in Mexico; I believe your husband said Skype?

A       Yes, he talked to us every night.

Q       Did you ever ask him about why he was in Mexico or did you encourage him to come back?

A       I always -- every night I asked him to come back.

Q       What finally prompted him to come back?

A       I think he missed us terribly.  And I think he had enough time to think about -- and we're a pretty close family.  We talk about things, and we pray a lot.  And I think he decided that he had enough time to consider all of his stuff, and he came back home.

Q       Were you concerned about his mental health while he was not in your presence?

A       Yes.

Q       Had you in the past or even now been assisting your son with getting any services for depression, things like that?

A       Yes.

Q       Were you involved, ma'am, in the discussions regarding your son's decision to attend school in Canada?

A       Yes, sir.

Q       All right.  And did you encourage him to do that or how did that come up?

A       Yes, I did.  We tried three different places, statewide, national, and disability for insurance because all of his medication and doctors' bills were coming out of

1    our pockets, and anybody can look at our salary, we don't

2    make a lot of money.  And we looked around to see what would

3    be the best option for him to, like his counselor said, to

4    see something new and to do something and do something

5    productive.

6            And we thought if -- I know French, and he was kind

7    of excited, we thought we would put him in French school,

8    and then welding school, and he could -- you have more of a

9    chance of an opportunity if you're bilingual.

10   Q     I didn't ask your husband this, but if you know this

11   or maybe the answer is -- what duty position did your son

12   have while he was in the Air Force, Air National Guard?  Was

13   he in intelligence, do you know?

14   A     Well, I know he got a top secret clearance.  I'm not

15   sure exactly the whole scheme of what they do in Terre Haute

16   there, but I know he was going to be a part of that.

17   Q     Right.  So when he went to Canada for the school, and

18   all, did you talk frequently to him about how he was doing

19   while he was in Canada?

20   A     Yeah, we spoke every night for at least half hour to

21   an hour.

22   Q     Do you believe that your son was going to Canada for

23   -- to escape prosecution or anything like that?

24   A     No, sir.  We never thought it was -- we thought it

25   was a huge mistake, that somebody got something wrong

1  somewhere and it would eventually work itself out.

2  Q      Were you ever asked yourself, ma'am, about the

3  whereabouts of your son by any law enforcement officer?

4  A      No, sir, and everybody knows where I work.  I have

5  got no response from anybody.

6  Q      If you were asked by a law enforcement officer about

7  where your son was, would you have told them where he was?

8  A      I would tell them where he was.

9  Q      You know that would be a serious crime if you didn't?

10 A      Absolutely.

11 Q      When did you learn, ma'am, when -- about your son's

12 arrest in this case?

13 A      Same time when he was picked up in Calais.

14 Q      Did you have any discussions at all with any

15 probation officers or defense attorneys in Maine about the

16 circumstances in this case?

17 A      No, sir.

18 Q      Were you willing to come if you were asked to come

19 testify there?

20 A      Absolutely, sir.

21 Q      Now, you have heard me ask about third party

22 custodian.  Did you and your husband discuss that?

23 A      Yes, we did.

24 Q      And you are willing to join in as a third party?

25 A      Absolutely.  I'll do whatever it takes, sir.

**Q** Willing to sign over your home or sign your home as collateral?

**A** I will.

**Q** You heard your husband say you have a car?

**A** Yes.

**Q** Did y'all bring documents regarding your car today?

**A** Yes, sir.

**Q** For what purpose?

**A** We'll turn over our car too, sir.

**Q** You understand the responsibility that goes with being a third party custodian, do you not?

**A** Yes, sir.

**Q** That you could not only be in trouble if you don't turn him in, but you can lose everything?

**A** Absolutely.

**Q** You are still willing to put up that risk?

**A** I believe my son will do what he's supposed to do, sir, and we'll do what we are supposed to do.

**Q** It's obvious that you and your husband love your son very much.

**A** We do, sir.

**Q** If he did something that was not in line with what he was supposed to do, it would be tough for you to turn him in, wouldn't it?

**A** It would, sir, but it would be the right thing to do.

Q       You would do it?

A       I would do it, sir.  It would be hard, but I would do it.

                MR. SMALL:  Thank you.

                THE COURT:  Cross?

                        CROSS-EXAMINATION

BY MR. EVERITT:

Q       Ms. Dehart, do you know whether or not Matt has any experience with firearms?

A       I believe he does, sir.

Q       Are there any firearms in your house now?

A       No, sir, they are all gone.

Q       Okay.  Where are they, ma'am?

A       My husband sold all of his, and I believe law enforcement has my son's other.

Q       Are you aware of the kind of penalties that might be facing Matt at the end of this ordeal?

A       I do, sir.

Q       And what do you understand those to be, ma'am?

A       I believe there's -- I'm not sure of the amount of time, but I know there's significant jail time.

Q       And that possibility out there is pretty distressing to you and your husband and probably with your son, isn't it?

A       Yes, it is, sir.

Q        Would that possibility have any kind of influence on
your willingness to call in to the probation officer if you
got home from work and Matt was just gone?

A        Sir, I have never done a wrong thing in my entire
life.  I don't even have a traffic ticket.  And I'm probably
one of the most model citizens.

        And I don't say that with any pride.  I say that
humbly.  But if my son did something that he wasn't supposed
to do, sir, yes, I would call the probation officer.  And he
knows that I would do that.

Q        Some people might say that a model mother would
protect her child at all costs.  How do you square those two
things, Ms. Dehart, citizen and the mother?

A        Well, sir, we have laws.  And if -- and we have to
abide by laws, and that's what makes us the kind of people
we are.  And it keeps us separate from -- I don't believe my
son is a criminal, so I'm not worried that this is even
going to happen, but there's right and there's wrong, and I
have a very good sense of that, sir.

        As much as I love my son and anybody else in my
family, I -- I certainly don't -- don't get me wrong, but I
certainly don't want to take my husband and myself down or
anybody else in my family doing something that we are not
supposed to do.

Q        Thank you, ma'am.

1          THE COURT:  Any redirect?

2                    REDIRECT EXAMINATION

3    BY MR. SMALL:

4    Q      Just one question.  Ms. Dehart, were you aware of

5    whether or not at the time that your son had that firearm,

6    did he have a permit for that firearm?

7    A      Yes.  Yes, sir.

8    Q      And do you know when it was that your husband sold

9    his firearms?

10   A      Oh, gosh, it's got to be a few months ago.

11   Q      Why did he do that?

12   A      Well, he wasn't using them.  They were mostly for

13   hunting and collectors, and we have a few gentlemen in our

14   church who are collectors and hunters, and so he sold them

15   to them.

16   Q      Probation officer never called you and said he had to

17   get rid of them or anything like that?

18   A      No.

19   Q      That's all I have, Your Honor.

20              THE COURT:  Why did he have a permit to carry a

21   concealed weapon?

22              THE WITNESS:  Honestly, ma'am, that's a good

23   question.  I'm not a pro of any kind of gun, so I really

24   couldn't give you an answer on that.

25              THE COURT:  Did you know that he had a permit to

1    carry a concealed weapon?

2            THE WITNESS:  I did.  I did.  I did.

3            THE COURT:  But you didn't know why?

4            THE WITNESS:  I'm not sure why he had a permit

5    to carry a gun.

6            THE COURT:  And, tell me, do you remember the

7    same visit that your husband testified about the law

8    enforcement person coming --

9            THE WITNESS:  (Witness moves head up and down.)

10           THE COURT:  Could you give me your version of

11   that, what you remember about that?

12           THE WITNESS:  Sure.  I remember we pulled up in

13   our driveway, and he was in -- I think he has either a black

14   or red truck, and he pulled up.

15       And he stepped out.  And like my husband said, one

16   thing that you notice about him, he's a very tall man.  And

17   he asked -- he shook my husband's hand, and he asked how

18   Matt was doing, specifically about his mental health and if

19   he was seeing counseling.

20       And we told him that, yeah, he's seeing counseling,

21   and my husband thanked him.  I didn't speak to him.  And

22   then we went into the house, like -- and then again we heard

23   a knock at the door.  I didn't even expect that it was him.

24       And I do remember -- I have a dog, I was holding my

25   dog so she wouldn't go after him.  I remember him saying

1   that he wanted to return all of the electronic stuff that
2   they had taken.

3          And my husband said, well, you can give those to
4   Mr. Canada and said, I'm sorry, I can't give you anything
5   else other than that, and then he was very polite to him and
6   shut the door.

7                    THE COURT:  Okay.  Thank you.  Anything else?
8                    MR. SMALL:  No, ma'am.
9                    THE COURT:  Okay.  You may step down.
10                   THE WITNESS:  Thank you.
11                   THE COURT:  Any other witnesses?
12                   MR. SMALL:  No other witnesses, Your Honor.
13                   THE COURT:  All right.  Does the government have
14  any witnesses?

15                   MR. EVERITT:  Well, Your Honor, at this point, I
16  suppose I would like to ask the Court two questions in that
17  regard, and we will determine what we need to do next.

18         First is whether or not the Court finds -- and I
19  think you may find that the defendant has met the burden of
20  presentation or the burden of production as outlined in our
21  papers.

22         If the answer to that question is yes, then my second
23  question to the Court will be if the Court is satisfied that
24  there's a sufficient basis to detain the defendant as set
25  forth in the transcript from the hearing in Maine or if the

Court would like to hear additional testimony, and I suppose
in terms of kind of road-mapping that out, if Your Honor at
this point can find there's a sufficient basis to detain
based on transcripts from Maine, then I would not want to
proffer any witnesses.

But if based on the testimony you have heard today,
the transcript from Maine is not sufficient to detain, then
I need to know that so I can put on a witness to present
some more evidence to the Court.

So I'm sort of asking you to make a preliminary
ruling to give me some guidance especially given the hour
and the fact that it's the end of the week.

THE COURT:  Well, I don't want to prevent you
from giving me any additional information that was not
introduced in Maine.  There was no testimony from Detective
Kniss in Maine.

I have read what you submitted.  I have read the
transcript, and he now has been indicted, so there is
certainly probable cause on the charges.

I guess, you know, if you wish to present something
new that is not in the transcript or your other papers, I
guess I would like to hear it.  I'm not sure it's entirely
necessary, but I don't want to foreclose anything additional
that you want to bring to my attention.

MR. EVERITT:  Okay.  Your Honor, I guess a

follow-up question would be, most of what Detective Kniss

would be proffering or testifying to in court is really

largely set forth in the synopsis document that was

submitted to Your Honor as Exhibit 2.

THE COURT:  Okay.

MR. EVERITT:  Now, of course, Mr. Small can't

cross-examine a synopsis document.  Mr. Small and I have

appeared before you many times, and I know that certainly

Mr. Small is not going to turn down an opportunity to

cross-examine; most defense attorneys won't.

I guess I don't know how the Court will treat that

synopsis document versus live testimony that might be

subject to cross-examination.  I don't want some of the

germane facts in there to be given less weight because

Mr. Small didn't get an opportunity to ask a follow-up

question.

THE COURT:  The Rules of Evidence don't apply in

a detention hearing, and Mr. Small knows that, and you know

that, and I know that, so I am, you know, taking this

synopsis document for what it's worth.

I guess, Mr. Small, do you have any interest in

putting Mr. Kniss on the stand for any reason?

MR. SMALL:  Well, Your Honor, if he's going to

just rehash what we have all read here, you know, I really

don't have an interest in hearing a lot of this again, but

1  certainly I may have my time to cross-examine Detective

2  Kniss, but I don't see a reason to do that.

3           THE COURT:  I think I have enough information to

4  make this decision, so --

5           MR. EVERITT:  Judge, may I just ask Detective

6  Kniss and make sure that he doesn't have anything -- I'm

7  standing in, so he and Ms. Daughtrey are so much more

8  familiar.  Let me check with him to make sure I'm not

9  stepping in it, so to speak.

10          THE COURT:  Okay.

11          (Pause.)

12          MR. EVERITT:  Judge, I think we can rest on the

13  synopsis.  And if you would like to hear from me in terms of

14  arguing the factors in the Stone case, I'm happy to do that,

15  but otherwise, given the hour and the time of the week, I'm

16  ready to have my seat.

17          THE COURT:  All right.  Do you want to argue,

18  Mr. Small?

19          MR. SMALL:  Your Honor, just some brief comments

20  about it.

21       Your Honor, we certainly want and appreciate the

22  opportunity to have presented the Deharts.  I mean, they --

23  they think there are some things that need to be explained,

24  particularly the trip to Mexico and the Canada connection,

25  and I guess one thing I would like to point out, obviously,

from the testimony of the Deharts, there didn't appear to be
any search or charges or anything like that from Mr. Dehart,
from Matthew.

So, I mean, a question -- I know the ruling from the
court in Maine and the opinion from the probation office
suggested that he was fleeing potential prosecution and
such.  I mean, there wasn't anything -- other than a search
warrant, Your Honor, there wasn't any instructions for
Mr. DeHart to remain in the jurisdiction.  He did come back.

As it stands now, Your Honor, and I don't know all
the details about how you get to Mexico, whether with a
driver's license, whether you just walk across.  Given the
immigration cases that we have in this district, it may be
easier than we think.

THE COURT:  I think it's probably to get in
there.

MR. SMALL:  Get in.

THE COURT:  I don't know at that time how easy
it was to get back.

MR. SMALL:  Yes, Your Honor, but he doesn't have
a passport or anything at this point.  It seems like he
would be reliant only on the support of his limited income
from his parents, who's willing to put up, Your Honor,
everything to secure his release.

They are willing to be third parties, Your Honor.  I

1    think one of the issues from the transcript involved this

2    GPS monitoring situation for child sex cases or minor victim

3    cases.  I believe at a minimum, Your Honor, as you are

4    aware, under 3142, I think (c) subparagraph 14, that at a

5    minimum, a condition of electronic monitoring which could be

6    set up at the Dehart home once they get a landline would

7    satisfy that in addition to the other conditions that are

8    referenced in the statute, 4, 5, 6 and 7 and 8.

9         Mr. Dehart can be given a curfew, Your Honor.  As you

10   are aware, this is the least restrictive condition for this

11   individual.  He could be made to report, obviously.  He

12   could be at the house 24/7.  His travel could be restricted.

13        So we would argue, Your Honor, he's not a serious

14   risk to flee as the statute mandates for detention.

15        In terms of his history, I understand the facts in

16   this case, Your Honor, I would point out that a lot of these

17   things happened a year before he was even served with a

18   search warrant.  And there's been no evidence presented that

19   there's been any demonstration of intimidation, threats or

20   anything since the warrant was executed.

21        Certainly, why the government waited that long to

22   charge him, that's up to them, but it certainly, I think,

23   takes away from the facts that they present that he's

24   dangerous.

25        So we would argue, Your Honor, that he could be

1    released on some very stringent conditions.  I see

2    Mr. Searcy is here, and there are several conditions that

3    they always recommend that Mr. Dehart can comply with.

4         His parents, like I said, I think are honorable

5    people, Your Honor.  I think that they would, you know,

6    report him immediately if something were to occur.

7         He could stay at the home, at their home.  They are

8    willing to put up their home or any assets that they may

9    have, Your Honor, to secure his release.  And we would

10   argue, Your Honor, that he should be released.

11        Given the facts as been presented today and according

12   to the transcript in May, I think the court didn't really

13   have much of a concern there about -- or as much of a

14   concern about the dangerousness issue as she was the flight

15   issue because of this monitoring situation.

16        So we think that all can be satisfied, Your Honor,

17   with some very stringent conditions, and we would ask the

18   Court to so rule.

19             THE COURT:  I do not -- this is a de novo review

20   of all this evidence and the testimony I have heard today.

21   I am not concerned about the safety of other people, but my

22   finding as to whether or not the defendant is a serious risk

23   of flight is by a preponderance of the evidence, and I'm

24   afraid that the preponderance of the evidence weighs very

25   heavily against releasing Mr. Dehart because of the serious

risk of flight.

These are the reasons for my decision.  His actions after the search warrant was executed, really fleeing the entire situation, perhaps not fleeing arrest but fleeing the entire situation knowing what they were looking for.

Knowing what he had done, his immediate response is to flee, and his father stated he didn't feel safe at our house.  And that, I'm sure, was because he was afraid he was going to be arrested; didn't have any family or any contacts in Mexico, very impulsive, very impulsive act.

And I note that he is ADHD which is, obviously, we all know, I certainly know, impulsive behavior is a hallmark of ADHD.

The decision to go to Canada may have been --
certainly that was a decision that his parents participated in, may have been motivated in part to get some insurance benefits that he was not receiving here, certainly probably was motivated by counseling recommendations for him to do something different, get out of the house, get on with a trade, get on with his life, get on with a profession, sounds like a very interesting thing to become a bilingual welder in Canada perhaps.  I mean, perhaps it was a really good idea to do something like that.

There were no charges pending, and so I see the decision to go to Canada as a little different than the

flight to Mexico.

Certainly it did take him out of the reach of the law for at least a while, so that could also have been a bit of a motivator.

But if we release him to his parents, first of all, there's no one home during the day to supervise him, he is going to be right back in the milieu where he committed these crimes that he is charged with, back in the milieu where the -- what must be a terrific invasion of privacy and fearful invasion of privacy by the execution of a search warrant. Even his parents testified about that, his mom testified about that. He's going to be right back in that situation.

And the seriousness of facing a 15 year minimum mandatory sentence for what he is charged with, in my view, is going to have a very strong likelihood of overwhelming his good sense and certainly do not impugn the integrity of his parents who obviously love I presume their only child dearly, will do anything for him, and I do believe that if they knew of something that they would try to do something about it.

But I think that the risk of his running away again, especially now that he knows he's been indicted and what kind of time he may be facing is simply by far much more than a preponderance of the evidence, a fear that he will

flee.

He has basically very few ties to the community. His parents have ties to the community, but really the testimony was he doesn't even have any friends in this community. No visitors. No friends. Apparently moved there after high school, and he has no community ties there. He apparently has never even worked there, never earned his own living.

His parents have been supporting him. He's 26. His parents have been supporting him, and the money to go to Mexico came from his nearby grandmother who might very well want to finance him again.

The Court is concerned that he would have had a permit to carry a concealed weapon, and his parents don't seem to know why he had that.

That, to me, also is kind of an indication of some impulsiveness, some lack of judgment; not really ever being employed, not supporting himself, even though he's 26 years old.

He did serve in the National Guard for a couple of years. The medication issue causes me some concern. I'm glad to hear that he is able to function well not on medication at this time.

There's some reference in some of this paperwork to attempted -- whether it was suicide or just an overdoes of Aderol in April of this year after this search, another

1    indication of the fact that he's scared to death, as he well

2    might be scared to death of what is facing him at the

3    moment, and I feel that there is a real risk of flight in

4    this case.

5         And despite the good intentions of his parents, I do

6    not find that putting him in their third party custodianship

7    is sufficient in this particular case.

8         So the motion for release is denied, and he will

9    remain detained.

10        Anything else?

11             MR. SMALL:  No, ma'am.  Thank you.

12             MR. EVERITT:  Thank you, Your Honor.

13             THE COURT:  We are in recess.

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3          I, BEVERLY E. "BECKY" COLE, Official Court

4   Reporter for the United States District Court for the Middle

5   District of Tennessee, with offices at Nashville, do hereby

6   certify:

7              That I reported on the stenotype shorthand machine

8   the proceedings held in open court on December 3, 2010 in

9   the matter of UNITED STATES OF AMERICA vs. MATTHEW PAUL

10  DEHART, Case No. 3:10-00250;

11             That a transcript of proceedings in connection

12  with the hearing was reduced to typewritten form by me;

13             That the foregoing transcript is a true and

14  accurate record of the proceedings to the best of my skills

15  and abilities;

16             This the 17th day of May, 2012.

17

18

19

20                          /s/
                    BEVERLY E. COLE, RPR
21

22

23

24

25