UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA,           )
                                    )
v.                                  )      NO.  3:10-cr-00250
                                    )      JUDGE TRAUGER
MATTHEW DEHART                      )
                                    )

RESPONSE TO MOTION TO SUPPRESS EVIDENCE

The United States of America, by and through S. Carran Daughtrey, Assistant United States Attorney for the Middle District of Tennessee, hereby submits the following response in opposition to defendant's Motion to Suppress Evidence, which asks this Court to suppress evidence seized from the defendant's residence in Newburgh, Indiana, and any fruits of that search. (R. 88: Motion to Suppress; R. 89: Memorandum; R. 107: Supplemental Memorandum). Defendant alleges that the search warrant was overbroad and that the search warrant contained misrepresentations that warrant a *Franks* hearing.  The government submits that the warrant is not overly broad, that no misrepresentations were made, and that a *Franks* hearing is unwarranted, as explained below.

**Statement of Facts**

This investigation of the instant case began in January 2009, when the parents of a minor teenager (also referenced as Minor #1 and "James" in the search warrant affidavit and referred to as "James" hereinafter) reported their concerns to the Franklin Police Department in Franklin, Tennessee.  (R. 105: Nashville Detention Hearing Transcript, hereinafter "DHT," at 59-60; R.

1

88-1: Search Warrant at 9, 12). The parents of James found that their son had been sending pornographic images of himself to "Matthew DiMarco" (later identified as the defendant, Matthew DeHart) since early 2008. (R. 105: DHT at 60). Eventually another minor teenager (also referenced as Minor #1 and "Pasha" in the search warrant and referred to as "Pasha" hereinafter) was also identified in the Franklin, Tennessee area. (R. 88-1: Search Warrant at 9, 12).

Throughout the investigation, it was revealed that Matthew DiMarco was in fact the defendant Matthew Dehart, and not a seventeen year old boy who lived in New Jersey and whose father was in the mafia. (R. 88-1: Search Warrant at 9, 12). Both James and Pasha had known the defendant for approximately one and one half to two years when they had met him playing the game, "World of Warcraft." (R. 88-1: Search Warrant at 9, 12). Both James and Pasha disclosed to law enforcement that the defendant had asked them to take photos of their penis' and email the pictures to accounts that allegedly belonged to females named "Erica" and "Mandy."(R. 88-1: Search Warrant at 9, 12). The defendant "introduced" the two victims to the females online. (R. 88-1: Search Warrant at 9, 12). Investigators, however, have never found independent corroboration that Erica and Mandy exist, nor has defendant identified any such "real" individuals. Additionally, the defendant, on several occasions, had sent several pornographic images to both James and Pasha on separate occasions. (R. 88-1: Search Warrant at 9, 13).

Further, on at least two separate occasions, the victims met with the defendant in Franklin, Tennessee. (R. 88-1: Search Warrant at 9, 12). Pasha, the sixteen year old victim, disclosed to law enforcement that he invited the defendant to Franklin two times, where the defendant provided beer and a narcotic, believed to be Adderol, to him. (R. 88-1: Search

2

Warrant at 10).  On that same occasion, Pasha skipped school and the defendant drove Pasha to the an indoor firing range in Murfreesboro, Tennessee.  The defendant had brought his own firearm and instructed Pasha to sign in as if he (Pasha) were eighteen years old.  (R. 88-1: Search Warrant at 10-12).

Detective Brett Kniss of the Franklin Police Department, the lead investigator in the case, got consent to examine the minor victims' computers.  (R. 88-1: Search Warrant at 12). The examination recovered "short video clips of James in which he was masturbating, chat logs, and several email addresses used by DeHart to communicate with the minor victims over the Internet, including some email addresses to which the minor victims had sent nude photographs of themselves."  (R. 88-1: Search Warrant at 12).

In his "Probable Cause" statement, Det. Kniss stated that "the chat logs clearly indicated that DeHart had knowledge of the nude photographs and that Minor #1 had sent them to an email account allegedly belonging to female girls in Indiana." (R. 88-1: Search Warrant at 12).

> [21:45] DeHart: cant ask
> [21:451 DeHart: u for dickpix
> [21:45] DeHart: cause ive already seen It
> [21:45] DeHart: so that is kinda
> [21:45] DeHart: off the table
> [21:45] DeHart: LOL
>
> [21:47] Minor #1: If I dont get a video for having a guy and girl see my dick im gonna be
>        pissed off

(R. 88-1: Search Warrant at 12).  Det. Kniss had been able to confirm that the user name in the chat above was associated with DeHart, and he changed the user names to "DeHart" and "Minor #1" for clarity and to avoid identifying the minor teenager.  This procedure is commonly done in this jurisdiction in an effort to assist in reading and understanding affidavits for warrants.

Another chat located on James' computer between James and an alleged female "indicated that Minor #1 was enticed to send the videos of himself masturbating." (R. 88-1: Affidavit at 13). The following is a portion of one of the chats between James and the alleged female:

[22:07] (alleged female from Indiana): okay im ericas friend and we lezz it out for guys
[22:07] (alleged female from Indiana): but only hot ones
[22:07] Minor #1: thats
[22:07] Minor #1: crazy
[22:07] (alleged female from Indiana): yeah u know whats more crazy?
[22:08] Minor #1: other than you thinking im hot
[22:08] Minor #1: what
[22:08] (alleged female from Indiana): you can make me a vid like u did for her
[22:08] (alleged female from Indiana): and in return
[22:08] (alleged female from Indiana): u get a vid of us 69ing
[22:08] (alleged female from Indiana): we decided on it
[22:09] Minor #1: thats
[22:09] Minor #1: a fairly good deal if you ask me
[22:09] (alleged female from Indiana): yes well she lost your videos anyways and I dont have one and I love your body
[22:10] (alleged female from Indiana): good well i need this video like tonight
[22:10] (allege female from Indiana): and I can do mine tonight/tomorrow morning
[22:11] Minor #1: actually..
[22:11] Minor #1: how bout
[22:11] Minor t#1: i have a vid
[22:12] (alleged female from Indiana): ?
[22:12] Minor #1: that I havent sent to erica yet she said she wanted one
[22:12] (alleged female from Indiana): I saw all the ones u showed her tho
[22:12] Minor #1: and I didnt give it to her yet
[22:12] (alleged female from Indiana): its new?
[22:12] (alleged female from Indiana): how good is it?
[22:12] Minor #1: Its like 9 or 10 mins bvut its cell cam
[22:12] (alleged female from Indiana): details please
[22:12] Minor #1: just me jerking off. simple
[22:12] (alleged female from Indiana): how much cum? ·
[22:13] Minor #1: Ill do another one tmrw if you give me yours first
[22:13] Minor #1: um above average
[22:13] (alleged female from Indiana): kay well send me this cell thing
[22:13] (alleged female from Indiana): here on aim is fine

4

(R. 88-1: Search Warrant at 13). Again, Det. Kniss had confirmed that the user name in the chat above was associated with DeHart purporting to be a teenage female, and thus the detective changed the user names to "(alleged female from Indiana)" and "Minor #1" for clarity and to avoid identifying the minor teenager. (R. 88-1: Search Warrant at 14).

James further relayed to Detective Kniss that he had a video on his computer that one of the alleged females sent to him. (R. 88-1: Search Warrant at 13). James told the detective where the video was located on the computer. Kniss found the video and it was of a minor female on a bed masturbating. (R. 88-1: Search Warrant at 13).

Through investigative techniques, the defendant was determined to be a twenty-four year old male living in Newburgh, Indiana. Furthermore, one of the victims "positively identified" the defendant in a photo lineup and the email addresses and IP addresses utilized to send the messages to James and Pasha were "assigned" to the defendant. (R. 88-1: Search Warrant at 14).

On January 22, 2010, Detective Kurt Prichett, a Task Force Officer with the Federal Bureau of Investigation and Detective with the Evansville Police Department sought a search warrant from the Warrick County Superior Court in Warrick, Indiana to search the defendant's residence. (R. 88-1: Search Warrant). In section A of the affidavit, Det. Prichett's affidavit he noted the crimes under investigation, to wit, "Possession of Child Pornography and Child Solicitation." (R. 88-1: Search Warrant at 2). He then listed the locations that he wanted to search in sections B. (R. 88-1: Search Warrant at 2). Next, in section C, Det. Prichett stated as follows: "That in said search your affiant intends to, and will be searching for, but not limited to, the following particular items/objects: computer, computer equipment, computer hardware, compact discs, DVDs, any audio and video tapes, photographs, recording equipment, cameras,

video cameras, wireless cameras, other electronics with recording capabilities, wireless phone, firearms and ammunition as well as contents and files stored on any of the above media." (R. 88-1: Search Warrant at 2). These items are all related to the online communication, recording of pornography, and weapon that are described in the attachments containing the probable cause. In section D, he stated "Affiant believes that the crime(s) listed in paragraph (A) have been committed, and that the item(s)/objects(s) listed in paragraph (C) are concealed in or about the residence, structure, person, and/or place and/or motor vehicle listed in paragraph (B) based on the following reasons and grounds." Finally, Det. Pritchett incorporated the his own "Supplemental Report," the "Investigative Synopsis Initial Summary" by Det. Sgt. Eric Anderson of the Franklin Police Department, and the "Probable Cause statement" by Det. Kniss. (R. 88-1: Search Warrant at 5, 8-11, and 12-14). In his own supplemental report, Det. Pritchett described the case as "involv[ing] 25 year old Matthew Paul Dehart . . . soliciting minor children (ages 14 and 16 at the time of the offenses) to send photographs and video of themselves masturbating. He has posed as juvenile females to obtain these photographs and video by electronic communications. Dehart has also had communications with the minor victims." Det. Pritchett concluded his short supplemental report three paragraphs later with the following request:

> At this time I am requesting a search warrant be issued for the residence of Matthew Dehart at [address] for the purpose of searching for evidence ***related to this case***. The facts of this case indicate that there may be photos of known victims in the residence, as well as on the computer of Matthew Dehart. The information I am also requesting the warrant to authorize searching the contents of the computer.

(R. 88-1: Search Warrant at 8) (emphasis added).

6

The Indiana Superior Court judge issued a 15 page warrant consisting of the above described details from the affidavit and attachments, as well as an order on the last page that clearly incorporated the affidavit: "You are authorized and ordered, in the name of the State of Indiana, with the necessary and proper assistance, to enter into or upon the particular residence, structure, person, and/or place set forth in paragraph (B) of the Affidavit attached herein, and there diligently search for the item(s) and/or object(s) listed in paragraph (C) of the Affidavit attached herein."  (R. 88-1: Search Warrant at 1-15).

Ultimately, on January 25, 2010, the search warrant was executed at the defendant's residence in Newburgh, Indiana, at which time a number of items relevant to the investigation were seized.  (R. 88-1: Search Warrant at 17-18).

## Legal Analysis

Defendant claims that he is entitled to a *Franks* hearing by making unsupported allegations that Det. Kniss misrepresented facts material to the issuance of the warrant.  The defendant, however, has failed to show that any misrepresentation occurred at all, and thus is not entitled to a *Franks* hearing.  Defendant also claims that the search warrant lacks particularity as to the items to be seized because the warrant does not explicitly reference the crime for which evidence is being sought, thus violating the Fourth Amendment.  The descriptions used in the warrant, however, are explicit and should be read as a whole.  Even if one of the many paragraphs in the warrant is not considered particular enough, any ambiguity in the warrant may be resolved by reference to the supporting affidavit.  Finally, even if this Court were to conclude

7

that a portion of the warrant lacks particularity, the Court should uphold the search under the good-faith exception of *United States v. Leon*, 468 U.S. 897 (1984).

I.     Defendant Is Not Entitled to a *Franks* Hearing.

Affidavits supporting judicially authorized warrants are presumed valid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). A defendant is entitled to a hearing to challenge the validity of a search warrant if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [ ] the allegedly false statement is necessary to the finding of probable cause." *Id.*, 438 U.S. at 155-56. If, at the evidentiary hearing, "the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search" suppressed. *Id.*, 438 U.S. at 156.

Pursuant to *Franks*, however, a defendant must initially satisfy a two-prong test in order to obtain an evidentiary hearing. *United States v. Hill*, 142 F.3d 305, 309 (6th Cir. 1998). First, a defendant must make a "substantial preliminary showing that specified portions of the affiant's averments are deliberately or recklessly false." *Id.* (citing *United States v. Campbell*, 878 F.2d 170, 171 (6th Cir. 1989)). The second prong of the *Franks* test requires a court to find that the challenged statements are necessary or material to a finding of probable cause. *Hill*, 142 F.3d at 309.

8

In the instant case, the defendant has not even met the initial threshold for having a *Franks* hearing. The defendant simply states that Det. Kniss intentionally misrepresented the facts because (1) he is wrong about whether Matthew DeHart represented himself as being teenage females in order to entice minors to send him sexually explicit material and (2) he replaced the user names in the chats to further that misrepresentation. These mere assertions are both insufficient and inconsistent with the "Probable Cause" statement written by Det. Kniss. (R. 88-1: Search Warrant at 12-14)

In examining these allegations, Det. Kniss's replacement of the actual user names of the chat participants is obvious ("DeHart," "Minor #1," and "(alleged female from Indiana)"). With regard to identifying the chat participants in the first chat, clearly indicated in his "Probable Cause" statement that he had interviewed the victims in the case, who had met DeHart through the online game "World of Warcraft," which uses live Internet chat. Det. Kniss also examined the computer used by James. Although Det. Kniss did not specifically state that James told him that his user name in the chat was "warcraftplaya11," there is no reason to believe otherwise and defendant has offered no proof otherwise. Next, the chats between James and defendant clearly show that the defendant is offering to "introduce" James online to teenage girls, Mandy and Erica, and DeHart even sends a purported picture of one of the girls. (R. 107-1: Chat at 1-4, 23). Additionally, DeHart addresses James directly and talks about Pasha frequently. (R. 107-1: Chat at 4, 6, 7, 8, 10, 11, 15, 16, 17, 19, 21). During the chats, DeHart is continuing to misrepresent himself as being able to do things like flying "the lear" "whenever i want." (R. 107-1: Chat at 7, 8, 20). DeHart also references taking Pasha to the firing range. (R. 107-1: Chat at 17, 18). On the very last page of the chats, DeHart mentions that he has seen the image of James's genitalia,

indicating that he really wants something more now. (R. 107-1: Chat at 24; R. 88-1: Search Warrant at 12). Finally, as stated in that statement, "[a]ll of the email addresses and the IP addresses used to send the messages were assigned to DeHart." (R. 88-1: Search Warrant at 14).

With regard to identifying the other chat participant in the second chat, Defendant argues that the second chat "clearly points to the fact that it is a female communicating with the minor," because there "is even a video of a female masturbating." (R. 89: Supplemental Memorandum at 2). Although the new chat participant represents himself/herself as a female, that would be possible for anyone, male or female. (R. 107-2: Chat at 1). Second, the statements made by "mandyylion092" do not sound like the typical language a fifteen year old girl would use upon first meeting a teenage boy online. (R. 107-1: Chat at 1-3). Next, it is clear that even James is suspicious of whether this girl is real, asking that she take a picture of herself with a piece of paper saying "hi james." (R. 107-1: Chat at 3). Finally, it is clear that this defendant has more than average computer knowledge, such that he would be able to manufacture such a character in hopes of getting sexually explicit material from a teenage boy.

In the "Probable Cause" statement, Det. Kniss was up front about not being able to obtain the IP addresses for the "teenage females" due to the time lapse between the incident and the report to law enforcement. But he also noted that the accounts had been created within the time period that the chat conversations took place, which would be quite coincidental if the teenage girls actually existed. (R. 88-1: Search Warrant at 14).

Although the "Probable Cause" statement might have been more complete if Det. Kniss had tediously explained how he drew the conclusions that he did, his decision not to include all the details is insufficient to deem his other statements misrepresentations. The Sixth Circuit has

10

held that "except in the very rare case where the defendant makes a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998). The defendant's mere assertion is erroneous, does not met the first prong of the *Franks* test, and thus is insufficient to warrant a *Franks* hearing.

II.     The Search Warrant Was Sufficiently Particular.

Defendant argues that the search warrant is overly broad because it does not explicitly limit the search of the computers or related equipment to evidence of any specific statutory violations. The government concedes that the search warrant is not the most artfully written search warrant / application, but a global examination of the search warrant indicates that the law enforcement agent who sought and executed the search warrant was indeed seeking child pornography and evidence of "child solicitation."

In *United States v. Ventresca*, in which the Supreme Court reviewed a search warrant to determine whether sufficient probable cause existed to issue the warrant, the Court reiterated its prior holding that informed and deliberate determinations of magistrates who are empowered to issue warrants are to be preferred over the hurried actions of law enforcement officers, in keeping with the foundations of the Fourth Amendment. 380 U.S. 102, 105-06 (1965) (citing *Aguilar v. Texas*, 378 U.S. 108 (1964)). *See also United States v. Leon*, 468 U.S. 897, 913-14 (1984). Although not the situation in the instant case, in *Jones v. United States*, the Supreme Court strongly supported this preference for search warrants by indicating that in a doubtful or

11

marginal case, a search pursuant to a warrant might be sustainable when a warrantless search would fall. *Jones v. United States*, 362 U.S. 257, 270 (1960). Thus the Supreme Court noted that "[i]f such teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. . . . Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *Ventresca*, 380 U.S. at 108. *See also United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010); *United States v. Chafin*, 622 F.2d 927, 929 (6th Cir. 1980) (citing *Ventresca*). The Sixth Circuit has noted that even when "sloppiness may raise flags, it is not in any way fatal because search warrant affidavits 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation.' What matters is the information contained in the affidavit." *United States v. Brooks*, 594 F.3d 488, 490 (6th Cir. 2010) (citing *Ventresca*) (involving a clear "cut and paste" warrant). Thus, the Sixth Circuit has held that the "particularity requirement may be satisfied through the express incorporation or cross-referencing of a supporting affidavit that describes the items to be seized, even though the search warrant contains no such description." *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011). The Supreme Court has "concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." *Leon*, 468 U.S. at 914.

In this case, defendant DeHart argues that the Indiana detective does not request that the search of the items "be related to files containing sexually explicit images of the minors who allegedly were enticed by the Defendant to send sexually explicit images of themselves to the Defendant" or that he be given authorization to seize "written communications (chats or e-mails)

12

between the minors and the Defendant." The defendant argues that "he simply asks for carte blanche authority to search not only the listed items without limitation but for other items 'not limited to' those requested." (R. 107: Supplemental Memorandum at 2-3).

Although the search warrant and application could have been crafted with more detail, this particular state warrant issued by an Indiana Superior Court judge does actually contain a limitation on what is to be searched if examined as a whole. Specifically, in an attachment to the affidavit (Det. Pritchett's "Supplemental Report"), the requesting law enforcement officer describes the case and requests the search warrant be issued "for the purpose of searching for evidence related to this case" which is specified earlier as being "Possession of Child Pornography" and "Child Solicitation," which is described in great detail in the two supplemental attachments written by law enforcement officers in Tennessee. (R. 88-1: Search Warrant at 8). The Sixth Circuit in *Richards* explained that a search warrant is sufficiently particular as long as a computer search is limited to a search for evidence explicitly authorized in the warrant. *Richards,* 659 F.3d at 540. Furthermore, the attachments to the affidavit leave little doubt that the investigation involved solicitation of minors and possession/distribution of child pornography. Since the order at the end of the search warrant in this case incorporated the affidavit and attachments, the search warrant itself contains this information.[1] (R. 88-1: Search Warrant at 15). The descriptions from different places within the warrant, considered together, are sufficient to allow the police to avoid searching and seizing the wrong items. That is, the

---

[1] Even if the affidavit and attachments had not been incorporated into the search warrant, the warrant would not have been flawed since the general rule is that a search warrant that fails to describe items to be searched with sufficient particularity can be cured by an accompanying affidavit if that affidavit is attached to the warrant and the warrant incorporates the affidavit by reference. *Groh v. Ramirez*, 540 U.S. 551, 557-58 (2004); *United States v. Gahagan*, 865 F.2d

13

scope of this warrant was restricted to a search for evidence of child pornography and child solicitation crimes and thus did not permit a free-ranging search.  It would defy reason and common sense to interpret this search warrant as being deficient for lack of organization and the preferred detail.

III.  <u>Even if the Warrant Lacked Particularity, Agents Executed the Warrant in Good Faith.</u>

Suppression would not be appropriate, even if the Court were to find that the search warrant was deficient.  The defendant has not devoted any attention to establishing the suitability of suppression in this case.  The defendant has not pled or proven that the detective's conduct was sufficiently culpable and premeditated such that it could be deterred or that his conduct was so egregious that it would merit the substantial toll it would take on public safety to compromise the case against the defendant.

Any error in the search warrant is merely an oversight, rather than some form of police misconduct.  The transgression is minor, not a substantial or deliberate Fourth Amendment violation.  The affiant in this case incorporated into his affidavit two thorough, detailed attachments, written by other law enforcement officers, which set forth probable cause; listed the crimes being investigated; and sought permission to search for evidence related to those crimes. He then sought approval from a neutral and detached magistrate judge.  Considering the warrant in its entirety, it is clear that the search warrant is authorizing a search for child pornography and solicitation of a child.  Furthermore, the search warrant was not so facially deficient that the executing agents could not reasonably presume that it was valid.  A review of the search warrant

---

1490, 1497 (6th Cir. 1989).

makes clear that the law enforcement officers who executed the warrant were not deliberately or recklessly trying to flaunt the Fourth Amendment, and thus there is no conduct to be deterred. Furthermore, the social cost of compromising a criminal case against a dangerous criminal like the defendant more than outweighs any deterrent value that would flow from suppression. The defendant has failed to carry his burden, and suppression under these facts would be an unjustified windfall for the defendant and serve no meaningful societal function.

Evidence, even when unlawfully obtained, should only be suppressed if 1) it would result in appreciable deterrence and 2) the deterrent value outweighs the social cost of ignoring reliable evidence bearing on the guilt of a dangerous criminal. *See Davis v. United States*, – U.S. –, 131 S. Ct. 2419, 2426-27 (2011). Even if the defendant's contention that there was a constitutional violation is considered true, suppression is not a personal right and does not necessarily follow from the fact of a constitutional infraction. *See id.* at 2427 (describing suppression as a "bitter pill"); *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (noting that "[s]uppression of evidence . . . has always been our last resort, not our first impulse"); *United States v. Master*, 614 F.3d 236 (6th Cir. 2010) (ordering remand for the court to consider whether suppression was appropriate following a finding of a violation of the Fourth Amendment). "The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations." *Davis*, 131 S. Ct. at 2426 (quotations and citations omitted). Accordingly, it is incumbent upon the defendant to justify suppression as a remedy even in instances where his rights have clearly been violated.

In *Herring v. United States,* 555 U.S. 135 (2009), the Supreme Court held that the fact of a Fourth Amendment violation "does not necessarily mean that the exclusionary rule applies." *Id.* at 140. "[P]olice conduct must be sufficiently deliberate that exclusion can meaningfully

deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144. Thus, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances, recurring or systemic negligence," but does not require suppression of evidence in a case where the officer's error "was the result of isolated negligence attenuated from the arrest." *Id.* "Real deterrent value is a 'necessary condition for exclusion," but it is not 'a sufficient one.'" *Davis*, 131 S. Ct. at 2427 (quotations and citations omitted). "Exclusion exacts a heavy toll on both the judicial system and society at large." *Id.* "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.*

The defendant has failed to plead or prove that the law enforcement officers' actions in this case would result in appreciable deterrence.

> The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. *Herring*, 555 U.S. at 143, 129 S. Ct. 695. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. *Id.* at 144, 129 S. Ct. 695. But when the police act with an objectively "reasonable good faith belief" that their conduct is lawful, *Leon, supra*, at 909 104 S. Ct. 3405 (internal quotation marks omitted), or when their conduct involves only simple "isolated" negligence, *Herring, supra* at 137, 129 S. Ct. 695, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way." *See Leon, supra*, at 919, 908, n. 6, 104 S. Ct. 3405 (quoting *United States v. Peltier*, 422 U.S. 531, 539, 95 S. Ct. 2313, 45 L. Ed.2d 374 (1974)).

*Id*. at 2427-28. By all accounts, the officers were acting in the "'reasonable good faith belief' that their conduct was lawful." *Id.* Suppression would have little deterrent effect.

16

The defendant has also failed to plead or prove that the deterrent value of suppression would outweigh the societal toll it would take by "letting guilty and possibly dangerous defendants go free–something that offends basic concepts of the criminal justice system." *See Herring*, 555 U.S. at 144 (quotations omitted). The Court has warned of the "grave adverse consequences that exclusion of relevant incriminating evidence always entails." *See Hudson*, 547 U.S. at 595. Failure to limit the application of the exclusionary rule to all but the few cases where the deterrent value of suppression outweighs the societal toll would also burden the system by encouraging extensive and unnecessary litigation. "The cost of entering this lottery would be small but the jackpot enormous: suppression of all evidence, amounting in many cases to a get-out-of-jail free card." *Id.* These countervailing concerns weigh particularly heavy in the defendant's case, since he has victimized a number of different minors; misrepresented himself, convincingly, to many individuals; and made threats to victims' families. The value of suppressing the evidence is far outweighed by the societal toll it would take to hamper the criminal case against the defendant.

By failing to make an attempt to justify why suppression is in order, the defendant takes it for granted that suppression would follow from any constitutional infraction. This is dated reasoning. *See United States v. Clariot*, 655 F.3d 550, 555 (6th Cir. 2011) (in the absence of a showing of appreciable deterrence, "[t]he only reason to suppress the evidence on this record is the theory, now discredited, that *all* Fourth Amendment violations must be punished by prohibiting the introduction of *any* evidence discovered after a violation, no matter how attenuated the connection to the underlying violation") (emphasis preserved); *United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010) (overruling the portion of *United States v. Scott*, 260

F.3d 512 (6th Cir. 2001), requiring suppression when a magistrate issues a warrant without authority because suppression "is no longer clearly consistent with current Supreme Court doctrine, as the Court has made clear in *Herring*"). "[T]he Supreme Court has since emphasized that the decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred." *Master*, 614 F.3d at 242 (citing *Herring*, 129 S. Ct at 700-01). It is the defendant's job to make this showing, not to leave it to the Court to perform this necessary part of the suppression analysis on its own. *See United States v. Steven Shaw*, No. 09-cr-20235, 2010 WL 5373915, at *5, n. 8 (W.D. Tenn. Dec. 17, 2010) (slip op.) (stating that "Defendant failed to address the separate issue of whether suppression is a suitable remedy. 'It is not [a court's job], especially in a counseled civil case, to create arguments for someone who has not made them or to assemble them from assorted hints and references scattered throughout the brief'") (citations omitted). The defendant turns the Court's instruction that exclusion is "a last resort not our first impulse," *see Hudson*, 547 U.S. at 591, on its head, assuming that suppression of any evidence with a nexus to the infraction should follow as a matter of right. Suppression should be the exception, not the rule and the defendant has fallen short of showing that suppression would serve any meaningful societal purpose. In the absence of this showing, suppression would amount to an undeserved windfall for a dangerous criminal who has exploited numerous minors. By failing to plead, let alone prove, that suppression should follow, the defendant has failed to properly state a claim, and his motion should be dismissed outright.

18

## Conclusion

In analyzing the challenged search warrant in this case, this Court should consider the warrant as a whole rather than focusing on individual paragraphs without the benefit of other limiting language. In reading the warrant, it is clear that the law enforcement officers were seeking permission to search for evidence of child solicitation and child pornography on computers, computer-related equipment, and recording equipment within the household from where the online communications had occurred, as well as to search for the weapon mentioned by one of the victims. Contrary to defendant's assertions, the warrant does not allow for *carte blanche* searching anything at the residence without limitation. Even if this court were to find that the search warrant lacked particularity, the evidence should not be suppressed because the officers executed the warrant in good faith, pursuant to *Leon* and *Herring*. Furthermore, defendant has failed to make a substantial preliminary showing that Det. Kniss made a false statement knowingly and intentionally, or with reckless disregard for the truth, and therefore, he is not entitled to a *Franks* hearing.

Wherefore, the government requests this Court deny defendant's motion to suppress the evidence in this case based on the submitted filings in this case.

Respectfully submitted,

JERRY E. MARTIN
United States Attorney for the
Middle District of Tennessee

s/ S. Carran Daughtrey
Assistant United States Attorney
110 Ninth Avenue South, Suite A-961
Nashville, Tennessee 37203-3870
Telephone: 615/736-5151

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served electronically or by mail to Mark C. Scruggs, attorney for defendant, on this, the 26th day of October, 2012.

<u>s/ S. Carran Daughtrey</u>
S. Carran Daughtrey
