UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:10-cr-00250 |
| | ) | |
| | ) | JUDGE TRAUGER |
| MATTHEW DEHART | ) | |
| | ) | |
| | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO SUPPRESS**

The United States of America, by and through Jimmie Lynn Ramsaur and Lynne T. Ingram, Assistant United States Attorneys for the Middle District of Tennessee, hereby submits the following response in opposition to Defendant's Motion to Dismiss and the Motion to Suppress.

**Statement of Facts**

A.  The Child Exploitation Investigation

The investigation of the instant case began in January 2009, when the parents of a minor teenager (also referenced as Minor #1 and "James" in the search warrant affidavit and referred to as "James" hereinafter) reported their concerns to the Franklin Police Department in Franklin, Tennessee (R. 105: Nashville Detention Hearing Transcript).  The parents of James found that their son had been sending images of himself to "Matthew DiMarco" (later identified as the defendant, Matthew DeHart) since early 2008. (R. 105).  Eventually another minor teenager (also referenced as Minor #2 and "Pasha" in the search warrant and referred to as "Pasha" hereinafter) was also identified in the Franklin, Tennessee area. (R. 88-1: Search Warrant).

1

Throughout the investigation, it was revealed that Matthew DiMarco was in fact the defendant Matthew Dehart, who was masquerading as a seventeen-year-old boy living in New Jersey and whose father was in the Mafia. (R. 88-1 Search Warrant). Both James and Pasha disclosed to law enforcement that the defendant had asked them to take photos of their penis' and email the pictures to accounts that allegedly belonged to females named "Erica" and "Mandy." (R. 88-1: Search Warrant). Investigators, however, have never found independent corroboration that Erica and Mandy exist, nor has the defendant identified any such "real" individuals. Additionally, the defendant, on several occasions, had sent several pornographic images to both James and Pasha on separate occasions (R. 88-1: Search Warrant).

Further, on at least two separate occasions, one of the victims met with the defendant in Franklin, Tennessee. (R. 88-1). Pasha, the sixteen year old victim, disclosed to law enforcement that he invited the defendant to Franklin two times, where the defendant provided beer and a narcotic, believed to be Adderol, to him. (R. 88-1). On that same occasion, Pasha skipped school and the defendant drove Pasha to the indoor firing range in Murfreesboro, Tennessee. The defendant had brought his own firearm and instructed Pasha to sign in as if he (Pasha) were eighteen years old. (R. 88-1).

Detective Brett Kniss of the Franklin Police Department, the lead investigator in this case, got consent to examine the minor victims' computers. (R. 88-1). The examination recovered "short video clips of James in which he was masturbating, chat logs, and several email addresses used by DeHart to communicate with the minor victims over the internet, including some email addresses to which the victims had sent nude photographs of themselves." (R. 88-1).

In his "Probable Cause" statement, Detective Kniss stated that "the chat logs clearly indicated that DeHart had knowledge of the nude photographs and that Minor #1 had sent them

to an email account allegedly belonging to female girls in Indiana. (R. 88-1).

> [21:45] DeHart: cant ask
> [21:45] DeHart: u for dickpix
> [21:45] DeHart: cause ive already seen It
> [21:45] DeHart: so that is kinda
> [21:45] DeHart: off the table
> [21:45] DeHart: LOL
>
> [21:47] Minor #1: If I don't get a video for having a guy and girl see my dick im gonna be pissed off

(R. 88-1).  Det. Kniss had been able to confirm that the user name in the chat above was associated with DeHart, and he changed the user names to "DeHart" and "Minor #1" for clarity and to avoid identifying the minor teenager.  This procedure is commonly done in this jurisdiction in an effort to assist in reading and understanding affidavits for warrants.

Another chat located on James' computer between James and an alleged female "indicated that Minor #1 was enticed to send the videos of himself masturbating." (R. 88-1). Again, Det. Kniss had confirmed that the username used to correspond with Minor #1 in the chat was associated with DeHart purporting to be a teenage female. (R. 88-1).

James further relayed to Detective Kniss that he had a video on his computer that one of the alleged females sent to him. (R. 88-1).  James told the detective where the video was located on his computer.  Kniss found the video and it was of a minor female on a bed masturbating (R. 88-1).

Through investigative techniques, the defendant was determined to be a twenty-four year old male living in Newburg, Indiana.  Furthermore, one of the victims "positively identified" the defendant in a photo lineup and the email addresses and IP addresses utilized to send the messages to James and Pasha were "assigned" to the defendant.  (R. 88-1).

On January 22, 2010, Detective Kurt Pritchett, a Task Force Officer with the FBI and Detective with the Evansville Police Department sought a search warrant from the Warrick County Superior Court in Warrick, Indiana to search the defendant's residence. (R. 88-1). In section A of Det. Pritchett's affidavit he noted the crimes under investigation, to wit, "Possession of Child Pornography and Child Solicitation." (R. 88-1 at 2). He listed the locations that he wanted to search in section B. (R. 88-1 at 2). Next, in section C, Det. Prichett stated as follows:

> "That in said search your affiant intends to, and will be searching for, but not limited to, the following particular items/ objects: computer, computer equipment, computer hardware, compact discs, DVDs, any audio and video tapes, photographs, recording equipment, cameras, video cameras, wireless cameras, other electronics with recording capabilities, wireless phone, firearms and ammunition as well as contents and files stored on any of the above media."

(R. 88-1 at 2). These items are all related to the online communication, recording of pornography, and weapon that are described in the attachments containing the probable cause. In section D, he stated "Affiant believes that the crime(s) listed in paragraph (A) have been committed, and that the item(s)/object(s) listed in paragraph (C) are concealed in or about the residence, structure, person, and/or place and/or motor vehicle listed in paragraph (B) based on the following reasons and grounds."

Finally, Det. Pritchett incorporated by his own "Supplemental Report," the "Investigative Synopsis Initial Summary" by Det. Sgt. Eric Anderson of the Franklin Police Department, and the "Probable Cause statement" by Det. Kniss. (R. 88-1 at 5). In his own supplemental report, Det. Pritchett described the case as "involv[ing] 25 year old Matthew Paul Dehart . . . soliciting mionr children (ages 14 and 16 at the time of the offenses) to send photographs and video of themselves masturbating. He has posed as juvenile females to obtain these photographs and video by electronic communications. Dehart has also had communications with the minor victims."

4

Det. Pritchett concluded his short supplemental report three paragraphs later with the following request:

> At this time I am requesting a search warrant to be issued for the residence of Matthew Dehart at [address] for the purpose of search for evidence ***related to this case***. The facts of this case indicate that there may be photos of known victims in the residence, as well as on the computer of Matthew Dehart. The information I am also requesting the warrant to authorize searching the contents of the computer.

(R. 88-1 at 8) (emphasis added).

The Indiana Superior Court judge issued a 15 page warrant consisting of the above described details from the affidavit and the attachments, as well as an order on the last page that clearly incorporated the affidavit:

> "You are authorized and ordered, in the name of the State of Indiana, with the necessary and proper assistance, to enter into or upon the particular residence, structure, person, and/or place set forth in paragraph (B) of the Affidavit attached herein, and there diligently search for the item(s) and/or object(s) listed in paragraph (C) of the Affidavit attached herein."

(R. 88-1 at 1-15). Ultimately, on January 25, 2010, the search warrant was executed at the defendant's residence in Newburgh, Indiana, at which time a number of items relevant to the investigation were seized (R. 88-1 at 17-18).

Evidence seized from the defendant's residence at 10270 Bourbon Street, Newburgh, Warrick County, Indiana during the search executed on or about January 25, 2010 included a Gateway laptop (and accompanying hardrive) and one Maxtor external hard drive, among other items. Data from the various devices seized have been analyzed by forensic personnel and continue to be analyzed through the ongoing investigation. The seizure of these and other items were documented on the return of the warrant.

The evidence remained in the custody of the Warrick County Sheriff's Office until it was released to Detective Brett Kniss. Detective Kniss took possession of the electronic evidence

and transferred custody to the Franklin, Tennessee Police Department which is documented by an evidence receipt for each item of evidence. Attached to the evidence receipts are chain of custody receipts documenting any release to law enforcement, who released it, the reason for the release, and the date of the release. Once Detective Kniss transferred the evidence to FBI Special Agent John McMurtrie on June 27, 2012, as reflected in the chain of custody receipts, FBI kept records of the chain of custody for each item of evidence in its possession. Similarly, when FBI transferred custody of the evidence to the U.S. Secret Service, the U.S. Secret Service kept records of the chain of custody for each item of evidence in its possession.

During the investigation of the allegations including the execution of the search warrant and charging the defendant by complaint and arrest warrant, this matter was assigned to Assistant United States Attorney Carrie Daughtrey. Neither Assistant United States Attorney Daughtrey nor any other Assistant United States Attorney in the Middle District of Tennessee were aware of any allegations that the defendant possessed classified material or other information that might be damaging to the United States government until well after the defendant was charged in this case.

B. Defendant's Initial Detention

The United States anticipates the following evidence will be presented at the evidentiary hearing in this case.

On August 6, 2010, at approximately 8:00 a.m., United States Immigration and Customs detained the defendant at the Calais, Maine Port of Entry into Canada. The defendant was detained pursuant to "an alert that DEHART was wanted for questioning in an espionage matter." The Federal Bureau of Investigation (FBI) began interviewing the defendant at 3:15 p.m. on August 6, 2010 and advised him that he was being questioned about his visit to an

6

embassy in Washington, D.C.  FBI agents advised the defendant of his constitutional rights, and defendant later agreed to speak with the FBI, but refused to sign the Advice of Rights form.

An arrest warrant was issued on August 6, 2010 for defendant charging him with one count of production of child pornography, in violation of Title 18, United States Code, Section 2251(a).  Agents arrested the defendant at approximately 5:20 p.m. for production and transport of child pornography, pursuant to a federal warrant from the Middle District of Tennessee.

The arrest warrant was based on an investigation that began in January of 2009, initiated by the Franklin Police Department in Franklin, Tennessee. During this investigation, law enforcement officers discovered and contacted victims from several states and traced various internet communications to the defendant. On January 22, 2010, Detective Kurt Pritchett, a Task Force Officer with the Federal Bureau of Investigation and Detective with the Evansville, Indiana Police Department sought a search warrant from the Warrick County Superior Court in Warrick, Indiana, to search the defendant's residence based on their investigation of child pornography and child solicitation that occurred in 2008 and 2009.  The warrant directed officers to search for and seize computers, computer equipment, computer hardware, compact discs, DVD's, any audio and video tapes, photographs, recording equipment, cameras, video cameras, wireless cameras, other electronics with recording capabilities, wireless phones, firearms and ammunition, as well as contents and files stored on any of the above media.    (See attached Exhibit A).   The search warrant was executed on January 25, 2010, at which time, a number of items relevant to the investigation were seized.

Federal agents transported the defendant from Calais, Maine to Bangor, Maine at approximately 5:58 p.m on August 6, 2010.  During the trip, the defendant continued to cooperate with officers regarding the espionage issues.  According to the FBI report, the

defendant was booked at the Penobscot County Jail in Bangor, Maine at approximately 7:30 p.m. on August 6, 2010.

On August 7, 2010, at approximately 12:55 a.m., the defendant was transported to the emergency room of Eastern Maine Medical Center with a main complaint of eye discomfort due to a possible pesticide exposure. (R. 123-1: Medical Records hereinafter "Exhibit 1" at 4). Dr. Christopher Geertz treated the patient and completed a "Final Report" after treatment was complete. (R. 123-1: Exhibit 1 at 4). In his Final Report, Dr. Geertz stated that prior to the defendant being incarcerated "he had a possible pesticide exposure." (R. 123-1: Exhibit 1 at 4). The defendant reported to Dr. Geertz that "there were some pellets lying on the ground that he thinks were pesticides that he apparently rubbed in his eyes and maybe rubbed on his skin, as well." (R. 123-1: Exhibit 1 at 4). Further, the defendant "again is not certain what these pellets were but he thinks they might have been pesticide. He cannot state why he rubbed them in his eyes and on his skin." (R. 123-1: Exhibit 1 at 4). Additionally, Dr. Geertz noted that the defendant was "restless and agitated, fairly tremulous as well as tachycardic." (R. 123-1: Exhibit 1 at 5). Defendant denied taking any illicit drugs. (R. 123-1: Exhibit 1 at 6). Dr. Geertz noted that the defendant appeared "to be paranoid and delusional with an idea of the FBI monitoring him and accusing him of espionage." (R. 123-1: Exhibit 1 at 6). After the examination, Dr. Geertz concluded that defendant's "acute psychosis associated with his tachycardia and tremors is most consistent with possible drug-induced psychosis such as secondary to amphetamines, cocaine, or other stimulant medications...Consider other toxic or metabolic pathology." (R. 123-1: Exhibit 1 at 7). Dr. Geertz further concluded that defendant may be suffering from "an acute psychotic break of bipolar disorder or schizophrenia." (R. 123-1: Exhibit 1 at 7). Before discharging defendant, at 3:05 a.m., Dr. Geertz noted that defendant was resting comfortably,

and that his "tachycardia and tremors have resolved.  He feels well for discharge."  (R. 123-1: Exhibit 1 at 7).  Dr. Geertz medically cleared defendant to return to the jail.  (R. 123-1: Exhibit 1 at 8).  He mentioned that he discussed at length with correctional officers that the patient required psychiatric evaluation while he was incarcerated, as well as reevaluation of the eye discomfort.  (R. 123-1: Exhibit 1 at 8).

A jail document notes that the defendant saw a nurse at the Penobscot County Jail in Bangor, Maine, at approximately 10:00 a.m. on August 7, 2010.  At that time, defendant informed the nurse that he had been on a variety of medications that he had not refilled for several months:  Lexapro, Wellbutrin XL, Abilify, Seroquel XR, Adderall XR, and Adderall.  Defendant did not provide any prescriptions in writing or medication, likely because he had not been taking them for some time.

Defendant was interviewed by the FBI a second time, on that same date, August 7, 2010 at 3:15 p.m..  The FBI report, which is classified but has been reviewed by the Court, reflects that defendant was not asked about the pending child exploitation case.  The defendant at that time initialed and signed a waiver of his rights and consented to answering questions without a lawyer present. At the same time, he signed a consent to search form and indicated that he would permit a complete search of "white Samsung slider phone (Virgin Mobile Canada)."  He signed a separate consent to search "U2 Special Edition IPod."

The Defendant also signed the following statement:

I, MATTHEW DEHART 10270 BOURBON ST. hereby authorize SA Adam v. KrameHoover and SSA Francis S. Cucinette, Special Agents of the Federal Bureau of Investigation, United States Department of Justice, to place a
        [check] Body Recorder
        [check] Transmitter
with JACOB ALLEN AKA JACOB DIEHL which I may have on or about 8-7-2010.

Another Penobscot County Jail document indicates that defendant was administered 50

9

mg (2 tablets of 25 mg each) of Thorazine on August 9, 2010. Two days later, a psychiatrist

from Indiana sent a letter written to Acadia Hospital Corp. stating that defendant had a diagnosis

of Mood Disorder Not Otherwise Specified and should be taking Lexapro, Abilify, Buproprian,

and Seroquel.

The FBI interviewed the defendant a third time on August 19, 2010, and the FBI report

reflects that defendant was not asked about the pending child exploitation case. Any statements

the defendant made on that date are unrelated to this investigation and will not be used in local

prosecution's case or to further the child exploitation investigation.

On August 19, 2010 at 10:45 a.m., the defendant signed a waiver of his right to counsel.

At that time, he also voluntarily consented to the search of the following items, with specific

instructions:

- "White" "Acer laptop computer located @ 37 Kensington Ct. Apt-13 Charlottetown P.E.I. in the RCA Microwave on top of the Toshiba Laptop"
- "I do not consent to search/seizure of the other 2 computers present."
- "Email Account: MDSICHERHEIT@gmail.com 14elmira905" With an arrow pointed to this written entry, he states "I allow you to search all content of said email account."
- "Email Account: ERLOESUNG@gmail.com PW: saved on acer" He stated next to this entery: "I allow you to search for anything related to the national security matter. I do not consent to any search related to vzw.com or vzwpix.com or verizonwireless.com."

On that same day, the defendant also signed a consent to assume online identity. He authorized

law enforcement to use KMFDMIS@AIM.com, MDSICHERHEIT@gmail.com, the screen

name 14elmira905, and ERLOESUNG@gmail.com. The consent form specifically states as

follows:

> "I understand that these law enforcement officers will changes the password(s) to this account so that I will no longer have access to these accounts. My internet online identity may be used by these law enforcement officers for any official purpose relating to an official investigation, including sending and receiving e-mail making direct communications on systms such as ICQ or AOL instant messaging, and any other electronic communications. I have been advised of my right to refuse to allow the assumption of my identity. I give this consent freely and voluntarily."

10

On that same day, the defendant also signed a consent to assume online identity for any of his

@HUSHMAIL.com accounts.

Again, on August 19, 2010, the defendant signed the following statement:

I, Matthew Dehart 10270 Bourbon ST Newburgh IN, hereby authorize any FBI agent and any Canadian law enforcement, Special Agents of the Federal Bureau of Investigation, United States Department of Justice, to install a recording device on a telephone located at ANYWHERE for the purose of recording any conversation I may have on that telephone with Allen Jaycob Deal, Brent Cooper, Dan Taylor, Deal's "Brother" on or about 8-19-2010 Forward/ Any future date. I have given this written permission to the above named Special Agents voluntarily, and without threats or promises of any kind.

At no time during August 2010, was defendant questioned about, nor did he make any

statements related to this case, and the government does not seek to admit any statements made

by defendant in August 2010.

**<u>Vindictive Prosecution</u>**

The defendant has made serious allegations about having been mistreated while in federal

custody, none of which are substantiated by the record or by affidavit of the defendant. For

example, the agents who interviewed him simply did not drug him on the day of his first

interview on August 6, 2010, or during either of the two subsequent interviews on August 7 and

August 19, 2010. Instead, it appears that the medical staff at the jail first administered the anti-

psychotic drug after the first two interviews and the visit to the emergency room for the self-

inflicted eye injury. Although the jail did not record the reason for first administering Thorazine,

such a drug is clearly utilized to calm people who are having psychotic episodes such that it is

not surprising that the jail made such an attempt to treat the defendant's symptoms of psychosis

on August 9, 2010.

Furthermore, defendant qualified a couple of consent forms he signed, allowing for

search of some items but not others, which indicates that he was in full control of his faculties,

aware of the nature and consequences of his conduct, and could act accordingly. The remaining allegations are similar in nature in that there is no support for their accuracy, other than unsworn self-serving statements of a defendant who has a history of making misrepresentations about himself. In summary, the allegations are unsupported, and the government denies them entirely.

The defendant has failed to properly avail himself of a presumption of vindictiveness, and even if he has—the objective facts already in the record and justification presented in this response adequately rebuts any presumption of vindictiveness. Nevertheless, should the Court deem further inquiry necessary, the United States requests an opportunity to place on the record objective justifications to rebut the presumption.

"In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.' " *United States v. Armstrong*, 517 U.S. 456, 464, (1996) (quoting *Bordenkircher*, 434 U.S. at 364, 98 S.Ct. 663). Because a claim of vindictive prosecution "asks a court to exercise judicial power over a 'special province' of the Executive," courts must begin from a presumption that the government has properly exercised its constitutional responsibilities to enforce the nation's laws. *Id.* (quoting *Heckler v. Chaney,* 470 U.S. 821, 832, (1985)). This "presumption of regularity" in prosecutorial decision making can only be overcome by "clear evidence to the contrary." *Id.* The standard of proof "is a demanding one." *Id.* at 463. While prosecutorial discretion is broad, it is not unfettered. *See Wayte v. United States,* 470 U.S. 598, 608 (1985). One limitation is provided by the Due Process Clause which protects a defendant against prosecutorial retaliation for the defendant's exercise of a statutory or constitutional right. *Goodwin v. United States*, 457 U.S. 368, 372 (1982). "To punish a person because he has done what the law plainly allows him to do

is a due process violation 'of the most basic sort.'" *Id.* (quoting *Bordenkircher* v. Hayes, 434 U.S. at 363).

Although a defendant can establish prosecutorial vindictiveness by producing affirmative evidence of actual vindictiveness, such a showing is "exceedingly difficult." *United States v. Dupree*, 323 F.3d 480, 489 (6th Cir. 2003). In the claim before this Court, it does not appear that the defendant has advanced a claim of actual vindictiveness; rather, defendant argues for a "presumption of vindictiveness."

The Due Process Clause, however, "is not offended by all possibilities of increased punishment . . . but only by those that pose a realistic likelihood of 'vindictiveness.'" *Blackledge v. Perry*, 417 U.S. 21, 27 (1974). For there to be a "realistic likelihood of vindictiveness," a defendant must show that it is "more likely than not" that the prosecutor's decision "result[ed] *solely* from the defendant's exercise of a protected legal right, rather than the prosecutor's normal assessment of the societal interest in prosecution." *See Alabama v. Smith*, 490 U.S. 794, 801-02 (1989); *Goodwin*, 457 U.S. at 380, n.11, 384 (*emphasis added*).

The Supreme Court has applied a presumption of vindictiveness to changes in charging decisions made by prosecutors after a defendant has chosen to appeal his conviction, *see Blackledge*, 417 U.S. at 27-28, and to increased sentences imposed by the same trial judge after a successful appeal, *North Carolina v. Pearce*, 395 U.S. 711, 725-26 (1969). The Court, however, "has been chary about extending the . . . presumption of vindictiveness when the likelihood of vindictiveness is not as pronounced as in *Pearce* and *Blackledge*." *Wasman v. United States*, 468 U.S. 559, 566 (1984). This hesitation is warranted "[g]iven the severity of such a presumption, . . . which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct." *Goodwin*, 457 U.S. at 373. Defendant cites to no

13

authority establishing a presumption of vindictiveness where, as here, the instant charges are based on conduct wholly unrelated to the exercise of a Constitutional right.

In the Sixth Circuit, a presumption of vindictiveness may apply only if the defendant can show: "(1) exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; (4) the intent to punish the defendant for exercise of the protected right." *United States v. Suarez*, 263 F.3d 468, 479 (6th Cir. 2001); *accord United States v. Andrews*, 633 F.2d 449 (6th Cir. 1980) (*en banc*).

Defendant contends that the timing of the issuance of his Complaint and Arrest Warrant suggests that this is a vindictive prosecution. However, the record fails to establish that a presumption of vindictiveness applies to this case.

A. Exercise of a Protected Right

Generally, a presumption of vindictiveness cannot exist unless the defendant, after the exercise of a procedural right, is charged more punitively than before based on the same underlying conduct. See, e.g., *United States v. Taylor*, 749 F.2d 1511, 1513 (11th Cir. 1985) ("When a prosecutor adds a new charge for relatively separate and distinct criminal conduct . . . , a defendant's due process rights are offended only if there is actual vindictiveness as opposed to the mere apprehension of vindictiveness"); *Humphrey v. United States*, 888 F.2d 1546 (11th Cir.1989) (*Blackledge* has no application where the "charges in the second indictment are not a substitution; indeed, they are different charges based upon independent acts"); *Suarez*, 263 F.3d at 480 ("Generally, a potentially vindictive superseding indictment must add additional charges or substitute more severe charges *based on the same conduct* charged less heavily in the first indictment") (*emphasis added*).

In particular, courts have found, separate and apart from the situation here, that the

existence of new evidence can support not only the reasonableness of the government's conduct (for purposes of determining whether a presumption applies), but also support a finding that a presumption has been rebutted. *See Suarez*, 263 F.3d at 480 ("If the prosecution can show that the additional charges were not brought earlier because they were based on new evidence, it will successfully rebut a showing of vindictiveness."); *Andrews*, 633 F.2d at 456, n.10; *Poole*, 407 F.3d at 777 (not vindictive to bring new charges following a hung jury when those charges were based on "a reevaluation of the case, in light of the evidence elicited during trial, subsequent jury discussions, and evidentiary rules affecting the admissibility of relevant evidence," which sufficed to rebut "any presumption of vindictiveness by showing that its decision to re-indict was not motivated by a vindictive desire to punish the defendant for exercising his right to trial").

If, nonetheless, the Court still determines that a presumption of vindictiveness applies despite the strong record against such a finding, the United States respectfully requests the opportunity to present "objective, on-the-record explanations" to rebut the presumption. *See Bragan v. Poindexter*, 249 F.3d 476, 482 (6th Cir. 2001) (internal quotation marks omitted). Although the Sixth Circuit has stated that a district court is not required to bifurcate its inquiry— by first determining whether a presumption exists, and only then requiring the government to rebut it—it has stated that a district court may, in its discretion, adopt that course, United States v. *LaDeau*, 734 F.3d 561, 573, n. 4 (6th Cir. 2013), which would be appropriate here.

Adopting such a course would be consistent with case law and general separation-of-powers considerations. Indeed, it is common in other contexts for courts to require a threshold showing by the defendant before requiring the government to reveal the intimate details of its investigation, its internal deliberations and process, or the exercise of its prosecutorial discretion—as would generally be required to rebut a presumption of vindictiveness. *Cf. Wade*

*v. United States*, 504 U.S. 181, 185-86 (1992) (requiring a substantial threshold showing of an unconstitutional motive before requiring the government to rebut it); *Armstrong*, 517 U.S. at 464 (requiring a threshold showing of discriminatory intent and discriminatory effect before the defendant will be entitled to discovery or an evidentiary hearing on the charging decision); *Franks v. Delaware*, 438 U.S. 154 (1978) (requiring a substantial preliminary showing before a defendant is entitled to an evidentiary hearing on a claim that a warrant was procured through false statements). Accordingly, if the Court determines that a presumption of vindictiveness applies, the United States requests the further opportunity to rebut the presumption with clear testimony regarding the prosecution of the defendant.

Here, we do not have a situation in which a defendant is being charged more punitively than before based on the same occurrence. In fact, here, the defendant is being charged in the first instance for his suspected crimes of producing and transporting child pornography. Production and transportation of CP is certainly not a protected right and is instead quite illegal.

The defendant's unsupported theories do not suggest that a reasonable person would think this were a vindictive prosecution. His bare assertions that he is being punished for his First Amendment activities as being minimally involved in an unconfirmed group's activities do not support his allegations. The government has not prosecuted him for chatting and expressing ideas on the internet; he is being prosecuted for the production and transport of child pornography, a crime that has substantial evidence of his involvement.

1. A prosecutorial stake in the exercise of that right

The defendant entirely fails to identify the "prosecutorial stake" that the government would have in this case. The government has an interest in protecting its children from predators who wish to exploit them. Forensic evidence supports that defendant solicited and received child

16

pornography from minors, so charging him was appropriate. Furthermore, it is unclear how his involvement with this group Anonymous would confer any sort of additional incentives on the part of the prosecution.

2. Unreasonableness of the prosecutor's conduct

Here, the defendant wholly fails to allege that the prosecutor acted unreasonably in charging him for production and transportation of child pornography. Instead, he makes a series of serious allegations about his treatment in federal custody that are unsupported by the record or by reality. He merely points to the fact that he was detained in Maine to discuss national security matters on the same date that a Middle Tennessee Court issued a warrant for his arrest in connection with his child pornography activities. He complains that the investigation for the production and transport had been open for several months prior to arrest, but this is to be expected due to the nature of the crime. Forensic analysts must decode and track digital artifacts; child victims often take a period of time to open up and candidly discuss their experiences; courts are bogged down with other cases. The time between when his case was opened and when he was ultimately arrested was reasonable under the circumstances. Investigators had to locate victims across several states, interview them, and determine whether they could affirmatively identify the defendant. After executing a search warrant on the defendant's home and seizing items relevant to the investigation, the process of decoding the computer evidence for incriminating information began and the investigation continued. In fact, the analysis in this case took longer than usual because one of the external hard drives seized was encrypted, which required an additional lengthy process to decode the drive before it could be examined.

3. The intent to punish the defendant for the exercise of the protected right

The defendant cannot establish the requisite intent on the part of the prosecution. Defendant purports to rely on the United States' decision to detain him at the Maine border for

questioning regarding his visit to an embassy and arrest him for a child exploitation crime on the same day as evidence of the prosecution's vindictive intent. However, both the questioning and the arrest warrant were results of separate and distinct individualized investigations into the defendant's conduct. The child exploitation case was an ongoing investigation where investigators had gathered information from several victims across many states from many sources, which further delayed the ultimate arrest. The United States has chosen to prosecute defendant in this case for a serious crime supported by substantial evidence.

## The United States Did Not Delete or Fail to Preserve Evidence

On October 6, 2015, the government received notice from the defense via email that the defendant would be withdrawing the sections of his motion to dismiss related to the deletion of defendant's email account. Therefore, we will not address the issue in our response.

## Involuntary and Unknowing waiver of custodial rights

### A. The Defendant Gave Valid Consent to Search.

The defendant next claims that any emails obtained by the government pursuant to his consent in August 2010, should be suppressed. As an initial matter, the government does not intend to use those emails as part of its case in chief and thus the issue is moot. Nevertheless, the totality of the circumstances establishes that consent was freely and voluntarily given. It is well-established that a search conducted without a warrant and probable cause is *per se* unreasonable, subject only to several specific exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). One such exception is a search conducted pursuant to consent. *Id.* Consent to search must be "freely and voluntarily given," *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968), and "not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth,* 412 U.S. at 228. The Sixth Circuit has found that consent to search is freely and

18

voluntarily given when "officers specifically asked if they could come in, and [the defendant] was not threatened, coerced, or tricked when he chose to let the officers into his room." *United States v. Carter*, 378 F.3d 584, 588 (6th Cir. 2004). Additionally, "it is well settled that valid consent may be given by a third party with common authority over the premises." *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010); *see* also *United States v. Matlock*, 415 U.S. 164, 171–72 (1974); *United States v. McCauley*, 548 F.3d 440, 446 (6th Cir. 2008). Thus, when the defendant's father granted the agents permission to enter the home to speak with the defendant, the agents were lawfully present in the home.

In addressing the voluntariness of consent to a search, the Supreme Court has held that whether a search is voluntary is a question of fact based on "the totality of all the circumstances." *Schneckloth,* 412 U.S. at 227. In determining the voluntariness of consent, the Court should consider several factors, including as follows: "'youth of the accused; his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.'" *United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010) (quoting *Schneckloth*, 412 U.S. at 226-27) (citations omitted)).

The "consent" exception applies to digital devices and computer networks, just as it applies to physical places and other containers. *See United States v. Stabile*, 633 F.3d 219, 230-31 (3d Cir. 2011); *United States v. King*, 604 F.3d 125, 137 (3d Cir. 2010); *United States v. Anderson*, No. 13-1003, 2013 WL 5498114, at *3-4 (7th Cir. Oct. 21, 2013) (consent to search for "documents" reasonably includes digital files contained on computers). Consent may be explicit or implicit, and the authority to consent may be actual or apparent. *See, e.g.*, *United States v. Buckner*, 473 F.3d 551, 555 (4th Cir. 2007); *United States v. Milian-Rodriguez*, 759

F.2d 1558, 1563-64 (11th Cir. 1985).

Where consent to search is given by an authorized person, a question still may arise as to the scope of that consent. As the Supreme Court has explained, "[t]he scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). In determining the scope of consent, courts apply a standard of "objective reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.*at 251.

Where a suspect consents to a search of his computer or device for one type of evidence and officers locate another type of evidence, Courts generally deny suppression motions where the initial consent was objectively reasonable and the searching agent either reaffirms the consensual search upon locating evidence of a different crime or discontinues the search pending receipt of a search warrant for the newly discovered crime. *See United States v. Lucas*, 640 F.3d at 175-77; *United States v. Suing,* 712 F.3d 1209 (8th Cir. 2013).

In *United States v. Lucas*, the Sixth Circuit upheld the denial of a motion to suppress child pornography found during a consensual search of a computer for evidence relating to narcotics. *Lucas*, 640 F.3d at 175-77. The defendant provided the officers with written consent to search his residence for "controlled substances, drug paraphernalia, and other material or records pertaining to narcotics." *Id.* at 177. During the search, an officer accessed a laptop and a thumb drive plugged into the laptop in the presence of the defendant, who did not object to the officer's actions. *Id.* In fact, the officer asked the defendant if the laptop was password protected, to which the non-objecting defendant responded in the negative. *Id.* at 177-78. The court noted that consent to search a residence does not necessarily equate to a "grant of broad authority to the police to open a suspect's non-secured computer and examine at will all the electronic files stored

there." *Id.* at 178. Instead, there should be an objectively reasonable basis for concluding that the seizure and search of digital devices was within the scope of consent to search the residence. Under the facts in *Lucas*, the court easily concluded that the officer's initial search of the laptop and thumb drive for evidence pertaining to narcotics was consensual. *Id.*

The court went on to affirm the denial of the motion to suppress images of child pornography found on the devices during the consensual search for narcotics evidence. Upon discovering the images, the officer stopped searching the computer and thumb drive and obtained from the defendant a separate written consent form expressly authorizing the seizure and examination of the devices. *Id.* at 172. Before conducting a forensic examination of the devices, officers also obtained a warrant to search them for evidence of child pornography, just in case the defendant revoked his consent during the forensic examination process. *Id.* In upholding this approach, the court emphasized that there was "no evidence that [the officer] intentionally searched for child pornography and purposefully exceeded the scope of Lucas's consent to search for 'other material or records pertaining to narcotics.' " *Id.* at 179.

The Eighth Circuit reached a similar result in *United States v. Suing*, 712 F.3d 1209 8th Cir. 2013). During a car stop, officers sought consent to search the defendant's vehicle for narcotics. The defendant signed a written consent form authorizing a search of the vehicle "to include luggage, containers and contents of all." *Id.* at 1210. The officers found an external hard drive in the front seat of the vehicle. Employing a review technique that should not be replicated for forensic reasons, the officers plugged the drive into a computer and began a manual search of the drive's contents. Almost immediately, the officers saw thumbnails of child pornography. They discontinued the search, pending receipt of a warrant authorizing a search for evidence of child pornography. *Id.* at 1211.

21

The Eighth Circuit rejected the defendant's argument that the child pornography evidence should be suppressed because the officers exceeded the scope of his consent to search the vehicle and the hard drive for narcotics evidence. *Id.* at 1212-13. The court concluded that the officers did not exceed the scope of consent, because they "did not abandon [the] drug search and continue a new, extended search for child pornography without judicial authority." *Id.* at 1212 (citing *United States v. Hudspeth*, 459 F.3d 922, 925-28, *rev'd in part on other grounds*, 518 F.3d 954 (8th Cir. 2008) (en banc)). Instead, they stopped and got a warrant covering child pornography crimes.

The Defendant claims he requested counsel during his initial questioning. This is contrary to the evidence and a baseless assertion. Therefore, the defendant's due process rights have not been infringed by FBI's access and search of his e-mail account.

B.   The Defendant Gave Valid Consent to Assume His Online Identity

An individual who owns or legitimately controls and uses a personal online account may consent to the use of that account and the assumption of any related online identity by a law enforcement agent. *See, e.g.*, *United States v. Meek*, 366 F.3d 705, 711-12 (9th Cir. 2004); *United States v. Sawyer*, 786 F. Supp. 2d 1352, 1357 (N.D. Ohio 2011). Moreover, individuals generally have no objectively reasonable expectation of privacy in files or other electronic data that they knowingly and voluntarily share with third persons. *See, e.g.*, *Chaney v. Fayette Cnty. Pub. Sch. Dist.*, No. 3:13-cv-89-TCB, 2013 WL 5486829, at *4-5 (N.D. Ga. Sept. 30, 2013) (plaintiff surrendered reasonable expectation of privacy in photograph posted on her "semi-private" Facebook profile, viewable by "friends and friends of friends"); *United States v. Bode*, No. ELH-12-158, 2013 WL 4501303, at *20-21 (D. Md. Aug. 21, 2013) (no reasonable expectation of privacy in chat logs conducted with social networking Web site where banners

22

notified users that unlawful activity would be reported to law enforcement); *United States v. Brooks*, No. 12-CR-166, 2012 WL 6562947, at * 2-3 (E.D.N.Y. Dec. 17, 2012) (no reasonable expectation of privacy in files shared through peer-to-peer network); *United States v. Soderholm*, No. 4:11-CR-3050, 2011 WL 5444053, at *6-7 (D. Neb. Nov. 9, 2011) (same). Instead, they assume the risk that the third person may consensually share their files or data with law enforcement agents. *See, e.g.*, *United States v. Ladeau*, No. 09-40021, 2010 WL 1427523, at *4-5 (D. Mass. Apr. 7, 2010). Thus, the target who communicates with a person whose online identity has been assumed by law enforcement, or who sends or receives data to/from the account of such person, is unlikely to succeed in challenging the use of such on Fourth Amendment grounds.

*United States v. Meek*, 366 F.3d 705, provides a good example of the "assumed online identity" principle. In *Meek,* police officers identified and located a minor boy whose sexually explicit photographs were found online. With his father's consent, the minor provided one of the officers with authorization to assume his AOL identity and to take over control of the minor's AOL account. *Id.* at 709. The officer then began to communicate online with Meek, who appeared to have prior online contact about sexual encounters with the boy. Meek eventually was arrested after he arranged to meet "the boy" for sexual purposes. *Id.* at 710-11.

Meek moved to suppress a subsequent search of his AOL account, arguing that the officers violated his Fourth Amendment rights by monitoring his online communications with "the minor" without judicial authorization. The Ninth Circuit affirmed the district court's denial of Meek's suppression motion, concluding that "[l]ike private telephone conversations, either party to a chat room exchange has the power to surrender each other's privacy interest to a third party." *Id.* at 711 (citing *United States v. Karo*, 468 U.S. 705, 726 (1984)). The court

23

characterized it as "a reality of the Internet that a person initiating an Internet-based conversation does not control [the recipient's subsequent use or disclosure of that conversation]." *Id.* (citing *Katz v. United States*, 389 U.S. 347 (1967)).

The same principle applies where a target has authorized a third person to access certain files via peer-to-peer networks. Even though such targets may have a subjective expectation of privacy in these accounts, they have no objectively reasonable expectation of such as to files or data they share with either third parties or the public at large. In *United States v. Sawyer*, 786 F.Supp.2d 1352 (N.D. Ohio 2011), the defendant created a "closed" peer-to-peer network through which he shared specific files only with certain computer users he had "invited" into his "closed" network. During transit, the files were encrypted. One of the users the defendant had invited into his "closed" network authorized a law enforcement agent to assume his online identity on that network. By doing so, the agent was able to view and download the files that the defendant chose to share with his network "friends." *Id.* at 1354-55.

After being charged with distribution of child pornography, the defendant moved to suppress the files downloaded from his computer by the undercover agent, as well as all evidence subsequently seized during the investigation. The district court denied the motion after finding that the defendant had no objectively reasonable expectation of privacy in the files he made available to others via the "closed" peer-to-peer network. *Id.* at 1355-56; *see also Ladeau*, 2010 WL 1427523, at *1-5. Once he voluntarily shared these files with even a limited number of third persons, the defendant "bore the risk that those 'friends' might turn the files over to law enforcement." *Id.* at 1356; *see also Ladeau*, 2010 WL 1427523, at *4 ("No matter how strictly Ladeau controlled who accessed his computer files, he had no control over what those people did with information about the files once he granted them access."). Even if such a privacy interest

existed, though, the court ruled that both the defendant and the user who consented to the assumption of his online identity authorized the agent to access the files contained in the defendant's "closed" network. *Sawyer*, 786 F.Supp.2d at 1356-57. Because this third party had "authority or control over the property subject to [the] search" (that is, the defendant's "shared" folder(s) on the "closed network"), that third party could voluntarily consent to the use of his identity to access those files. *Id.* at 1357; *see also Brooks*, 2012 WL 6562947, at *2-3; *Soderholm*, 2011 WL 5444053, at *6-7. The same is true of file sharing on public networks. *See, e.g.*, *United States v. Stults*, 575 F.3d 834, 843 (8th Cir. 2009); *United States v. Ganoe*, 538 F.3d 1117, 1127 (9th Cir. 2008).

## Chain of Custody

Defendant further claims that the evidence obtained from the computer related items seized pursuant to the search warrant on January 25, 2010, should be suppressed because he claims there are problems with the chain of custody which could mean that the evidence has been altered since the seizure. Nothing could be further from the truth. Defendant's allegations are pure speculation and have no basis or support in fact. The objection is based on mere conjecture and a requested inference.

A. <u>Legal Standard</u>

Physical evidence may be admitted when there has been a showing that the exhibit offered is in substantially the same condition as it was when the crime was committed. United States v. Robinson, 104 F.3d 361 (6th Cir. 1996) (citing *United States v. Aviles,* 623 F.2d 1192, 1197 (7th Cir.1980)). "Absent a clear showing of abuse of discretion, challenges to the chain of custody go to the weight of evidence, not its admissibility." *Id.* (citing *United States v. Levy,* 904 F.2d 1026, 1030 (6th Cir.1990), *cert. denied sub nom. Black v. United States,* 498 U.S. 1091

(1991)). "[A] missing link does not prevent the admission of real evidence, so long as there is sufficient proof that the evidence is what it purports to be and has not been altered in any material aspect." *Id.* (quoting *United States v. Howard-Arias,* 679 F.2d 363, 366 (4th Cir.1982), *quoting United States v. Jackson,* 649 F.2d 967 (3d Cir.), *cert. denied,* 454 U.S. 1034 (1981)).

If evidence not readily identifiable, and is susceptible to tampering or contamination, chain of custody evidence is required to show that substitution, tampering, or contamination is improbable. United States v. Cardenas, 864 F.2d 1528, 1531 (10th Cir. 1989). However, the opponent's "'merely raising the possibility ... of tampering is not sufficient to render evidence inadmissible.'" United States v. Thomas, 294 F.3d 899, 905 (7th Cir. 2002). Once the standard is met, lack of proof of connection, etc. goes to weight, not admissibility. United States v. Santana, 898 F.2d 821, 824 (1st Cir. 1990). United States v. Hernandez-Herrera, 952 F.2d 342, 44 (10th Cir. 1991). United States v. Long, 857 F. 2d 436, 441-42 (8th Cir. 1988), cert. denied, 502 U.S. 828 (1991).

In order to satisfy the chain of custody requirement, the government need show only that it took reasonable precautions to preserve the original condition of the evidence and does not have to exclude all possibilities of tampering. There is a presumption of regularity that attaches to the official acts of public officers. *Tatum*, *supra*. *United States v. Lee*, 502 F.3d 691 (7th Cir. 2007); *United States v. Thomas*, 294 F.3d 899, 905 (7th Cir. 2002). Thus, absent affirmative evidence of tampering, it will not be presumed that investigators have tampered with items in official custody. *United States v. Johnson*, 977 F.2d 1360-1368 (10th Cir. 1992), *cert. denied*, 506 U.S. 1070 (1993). The fountainhead of this doctrine is found in *United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926), "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they

26

have properly discharged their official duties." If evidence is in official custody at all times and there is no evidence of tampering, the presumption of proper handling arises. *United States v. Thomas*, 294 F.3d 899, 905 (7th Cir. 2002).

    B.  Argument

Here, the evidence offered with regard to the Maxtor BlackArmor drive and the Gateway Laptop is in substantially the same condition as when the defendant produced and transported child pornography on them.  There is no "missing link" in the chain of custody to worry about: when the items were seized from the defendant's home, officers prepared an intake form itemizing the hardware when it was seized; an evidence receipt was created when the items were taken into evidence; the only release of the items was to other federal or state agents; a chain of custody report was compiled, and agents complied with reporting policies at all stages of this investigation.  This care in recording and reporting indicates that the government did exercise reasonable precautions to preserve the original condition of the hard drives, thereby entitling the prosecution the benefit of the presumption of regularity.   In addition, analysis of the computer evidence seized clearly indicates that the last activity on the hardware was the day before the seizure, January 24, 2010.  No changes or alterations have occurred since the seizure.  The evidence was appropriately preserved.

Defense relies on *United States v. Robinson*, 367 F. Supp. 1108 (E.D. Tenn. 1973) and *United States v. McFadden*, 458 F.2d 440 (6th  Cir. 1972) to support its assertion that the chain of custody for the hard drives is sufficient.  In doing so, it misconstrues the holdings of those cases.

In *McFadden*, where the defendant was charged with bank robbery, the Court admitted into evidence a note purportedly used by the robber and the fingerprints taken therefrom.  458

27

F.2d at 441.  One of the tellers identified the note as the one used, and the note was accounted for

except for a brief interval between the robber and the police's arrival on the scene.  The Court

stated that "[s]uch physical evidence is admissible where the possibilities of misidentification or

alteration are eliminated, not absolutely, *but as a matter of reasonable probability*." *Id.* (quoting

*Gass v. United States*, 416 F.2d 747, 770 (1969)) (emphasis added) (internal quotations omitted).

In *Robinson*, where the defendant was charged with unlawful possession of a firearm, the

Court ruled that the chain of custody for the handgun in question was insufficient because it was

not marked at the time of seizure and was left unattended and without anyone's conscious

custody in the reception room of the recorder and city judge of Newport for parts of two days,

where it was available to traffic by the general public and was once taken outside the building

and filed several times before coming into the custody of the chief of police.  367 F. Supp. at

1109.  The court did not rely on the two-day time period as grounds for exclusion,  as the

defendant contends, but rather asserted:

> As the proposed exhibit had passed through so many hands before being produced in
> court, it was necessary to establish a complete chain of evidence, tracing the possession
> of the proposed exhibit to the final custodian. As it is not shown by the evidence that the
> government agent acquired custody of the weapon seized from the defendant, the
> proposed exhibit cannot be received in evidence

United States v. Robinson, 367 F. Supp. 1108, 1109 (E.D. Tenn. 1973).   Unlike the officials in

*Robinson*, the Government in this case recorded the acquisition of these items on an intake form,

created an evidence receipt when the hard drives were marked into evidence, released the items

only to other authorized federal agents, and fully complied with compiling a chain of custody

report at all stages of the investigation.  Therefore, *Robinson* has no bearing on the case at hand.

### Particularity of the Search Warrant

Defendant argues that the search warrant is overly broad because it does not explicitly

limit the search of the computers or related equipment to evidence of any specific statutory

violations. The government concedes that the search warrant is not the most artfully written search warrant / application, but a global examination of the search warrant indicates that the law enforcement agent who sought and executed the search warrant was indeed seeking child pornography and evidence of "child solicitation."

In *United States v. Ventresca*, in which the Supreme Court reviewed a search warrant to determine whether sufficient probable cause existed to issue the warrant, the Court reiterated its prior holding that informed and deliberate determinations of magistrates who are empowered to issue warrants are to be preferred over the hurried actions of law enforcement officers, in keeping with the foundations of the Fourth Amendment. 380 U.S. 102, 105-06 (1965) (citing *Aguilar v. Texas*, 378 U.S. 108 (1964)). *See also United States v. Leon*, 468 U.S. 897, 913-14 (1984). Although not the situation in the instant case, in *Jones v. United States*, the Supreme Court strongly supported this preference for search warrants by indicating that in a doubtful or marginal case, a search pursuant to a warrant might be sustainable when a warrantless search would fall. *Jones v. United States*, 362 U.S. 257, 270 (1960). Thus the Supreme Court noted that "[i]f such teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. . . . Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *Ventresca*, 380 U.S. at 108. *See also United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010); *United States v. Chafin*, 622 F.2d 927, 929 (6th Cir. 1980) (citing *Ventresca*).

The Sixth Circuit has noted that even when "sloppiness may raise flags, it is not in any way fatal because search warrant affidavits 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation.' What matters is the information contained in the affidavit."

*United States v. Brooks*, 594 F.3d 488, 490 (6th Cir. 2010) (citing *Ventresca*) (involving a clear "cut and paste" warrant).  Thus, the Sixth Circuit has held that the "particularity requirement may be satisfied through the express incorporation or cross-referencing of a supporting affidavit that describes the items to be seized, even though the search warrant contains no such description."  *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011).  The Supreme Court has "concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination."  *Leon*, 468 U.S. at 914.

Although the search warrant and application could have been crafted with more detail, this particular state warrant issued by an Indiana Superior Court judge does actually contain a limitation on what is to be searched if examined as a whole.  Specifically, in an attachment to the affidavit (Det. Pritchett's "Supplemental Report"), the requesting law enforcement officer describes the case and requests the search warrant be issued "for the purpose of searching for evidence related to this case" which is specified earlier as being "Possession of Child Pornography" and "Child Solicitation," which is described in great detail in the two supplemental attachments written by law enforcement officers in Tennessee.  (R. 88-1: Search Warrant at 8).  The Sixth Circuit in *Richards* explained that a search warrant is sufficiently particular as long as a computer search is limited to a search for evidence explicitly authorized in the warrant.  *Richards,* 659 F.3d at 540.  Furthermore, the attachments to the affidavit leave little doubt that the investigation involved solicitation of minors and possession/distribution of child pornography.  Since the order at the end of the search warrant in this case incorporated the affidavit and attachments, the search warrant itself contains this information.[1]  (R. 88-1: Search

---

[1] Even if the affidavit and attachments had not been incorporated into the search warrant, the warrant would not have been flawed since the general rule is that a search warrant that fails to describe items to be searched with sufficient particularity can be cured by an accompanying affidavit if that affidavit is attached to the warrant and the

30

Warrant at 15). The descriptions from different places within the warrant, considered together, are sufficient to allow the police to avoid searching and seizing the wrong items. That is, the scope of this warrant was restricted to a search for evidence of child pornography and child solicitation crimes and thus did not permit a free-ranging search. It would defy reason and common sense to interpret this search warrant as being deficient for lack of organization and the preferred detail.

Even if the Warrant Lacked Particularity, Agents Executed the Warrant in Good Faith. Suppression would not be appropriate, even if the Court were to find that the search warrant was deficient. The defendant has not devoted any attention to establishing the suitability of suppression in this case. The defendant has not pled or proven that the detective's conduct was sufficiently culpable and premeditated such that it could be deterred or that his conduct was so egregious that it would merit the substantial toll it would take on public safety to compromise the case against the defendant.

Any error in the search warrant is merely an oversight, rather than some form of police misconduct. At worst, the transgression is minor, not a substantial or deliberate Fourth Amendment violation. The affiant in this case incorporated into his affidavit two thorough, detailed attachments, written by other law enforcement officers, which set forth probable cause; listed the crimes being investigated; and sought permission to search for evidence related to those crimes. He then sought approval from a neutral and detached magistrate judge. Considering the warrant in its entirety, it is clear that the search warrant is authorizing a search for child pornography and solicitation of a child. Furthermore, the search warrant was not so facially deficient that the executing agents could not reasonably presume that it was valid. A

---

warrant incorporates the affidavit by reference. *Groh v. Ramirez*, 540 U.S. 551, 557-58 (2004); *United States v. Gahagan*, 865 F.2d 1490, 1497 (6th Cir. 1989).

review of the search warrant makes clear that the law enforcement officers who executed the warrant were not deliberately or recklessly trying to flaunt the Fourth Amendment, and thus there is no conduct to be deterred. The officers executed what they believed to be a valid search warrant in good faith, and that good faith should not be punished. Furthermore, the social cost of compromising a criminal case against a dangerous criminal like the defendant more than outweighs any deterrent value that would flow from suppression. The defendant has failed to carry his burden, and suppression under these facts would be an unjustified windfall for the defendant and serve no meaningful societal function.

Evidence, even when unlawfully obtained, should only be suppressed if 1) it would result in appreciable deterrence and 2) the deterrent value outweighs the social cost of ignoring reliable evidence bearing on the guilt of a dangerous criminal. *See Davis v. United States*, – U.S. –, 131 S. Ct. 2419, 2426-27 (2011). Even if the defendant's contention that there was a constitutional violation is considered true, suppression is not a personal right and does not necessarily follow from the fact of a constitutional infraction. *See id.* at 2427 (describing suppression as a "bitter pill"); *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (noting that "[s]uppression of evidence . . . has always been our last resort, not our first impulse"); *United States v. Master*, 614 F.3d 236 (6th Cir. 2010) (ordering remand for the court to consider whether suppression was appropriate following a finding of a violation of the Fourth Amendment). "The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations." *Davis*, 131 S. Ct. at 2426 (quotations and citations omitted). Accordingly, it is incumbent upon the defendant to justify suppression as a remedy even in instances where his rights have clearly been violated.

In *Herring v. United States,* 555 U.S. 135 (2009), the Supreme Court held that the fact of a Fourth Amendment violation "does not necessarily mean that the exclusionary rule applies."

*Id.* at 140. "[P]olice conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144. Thus, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances, recurring or systemic negligence," but does not require suppression of evidence in a case where the officer's error "was the result of isolated negligence attenuated from the arrest." *Id.* "Real deterrent value is a 'necessary condition for exclusion,' but it is not 'a sufficient one.'" *Davis*, 131 S. Ct. at 2427 (quotations and citations omitted). "Exclusion exacts a heavy toll on both the judicial system and society at large." *Id.* "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.*

The defendant has failed to plead or prove that the law enforcement officers' actions in this case would result in appreciable deterrence.

> The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. *Herring*, 555 U.S. at 143, 129 S. Ct. 695. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. *Id.* at 144, 129 S. Ct. 695. But when the police act with an objectively "reasonable good faith belief" that their conduct is lawful, *Leon, supra*, at 909 104 S. Ct. 3405 (internal quotation marks omitted), or when their conduct involves only simple "isolated" negligence, *Herring, supra* at 137, 129 S. Ct. 695, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way." *See Leon, supra*, at 919, 908, n. 6, 104 S. Ct. 3405 (quoting *United States v. Peltier*, 422 U.S. 531, 539, 95 S. Ct. 2313, 45 L. Ed.2d 374 (1974)).

*Id.* at 2427-28. By all accounts, the officers were acting in the "'reasonable good faith belief' that their conduct was lawful." *Id.* Suppression would have little deterrent effect.

The defendant has also failed to plead or prove that the deterrent value of suppression

33

would outweigh the societal toll it would take by "letting guilty and possibly dangerous defendants go free–something that offends basic concepts of the criminal justice system." *See Herring*, 555 U.S. at 144 (quotations omitted). The Court has warned of the "grave adverse consequences that exclusion of relevant incriminating evidence always entails." *See Hudson*, 547 U.S. at 595. Failure to limit the application of the exclusionary rule to all but the few cases where the deterrent value of suppression outweighs the societal toll would also burden the system by encouraging extensive and unnecessary litigation. "The cost of entering this lottery would be small but the jackpot enormous: suppression of all evidence, amounting in many cases to a get-out-of-jail free card." *Id.* These countervailing concerns weigh particularly heavy in the defendant's case, since he has victimized a number of different minors; misrepresented himself, convincingly, to many individuals; and made threats to victims' families. The value of suppressing the evidence is far outweighed by the societal toll it would take to hamper the criminal case against the defendant.

By failing to make an attempt to justify why suppression is in order, the defendant takes it for granted that suppression would follow from any constitutional infraction. This is dated reasoning. *See United States v. Clariot*, 655 F.3d 550, 555 (6th Cir. 2011) (in the absence of a showing of appreciable deterrence, "[t]he only reason to suppress the evidence on this record is the theory, now discredited, that *all* Fourth Amendment violations must be punished by prohibiting the introduction of *any* evidence discovered after a violation, no matter how attenuated the connection to the underlying violation") (emphasis preserved); *United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010) (overruling the portion of *United States v. Scott*, 260 F.3d 512 (6th Cir. 2001), requiring suppression when a magistrate issues a warrant without authority because suppression "is no longer clearly consistent with current Supreme Court

34

doctrine, as the Court has made clear in *Herring*").  "[T]he Supreme Court has since emphasized that the decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred."  *Master*, 614 F.3d at 242 (citing *Herring*, 129 S. Ct at 700-01).  It is the defendant's job to make this showing, not to leave it to the Court to perform this necessary part of the suppression analysis on its own.  *See United States v. Steven Shaw*, No. 09-cr-20235, 2010 WL 5373915, at *5, n. 8 (W.D. Tenn. Dec. 17, 2010) (slip op.) (stating that "Defendant failed to address the separate issue of whether suppression is a suitable remedy.  'It is not [a court's job], especially in a counseled civil case, to create arguments for someone who has not made them or to assemble them from assorted hints and references scattered throughout the brief'") (citations omitted).  The defendant turns the Court's instruction that exclusion is "a last resort not our first impulse," *see Hudson*, 547 U.S. at 591, on its head, assuming that suppression of any evidence with a nexus to the infraction should follow as a matter of right.  Suppression should be the exception, not the rule and the defendant has fallen short of showing that suppression would serve any meaningful societal purpose.  In the absence of this showing, suppression would amount to an undeserved windfall for a dangerous criminal who has exploited numerous minors.  By failing to plead, let alone prove, that suppression should follow, the defendant has failed to properly state a claim, and his motion should be dismissed outright.

## Conclusion

For the reasons stated above, the government respectfully requests that defendant's motion to dismiss be denied.

Respectfully submitted,

DAVID RIVERA
United States Attorney for the
Middle District of Tennessee

s/ Lynne T. Ingram
Lynne T. Ingram
Assistant United States Attorney
110 Ninth Avenue South, Suite A-961
Nashville, Tennessee 37203-3870
Telephone: (615) 736-5151

s/ Jimmie Lynn Ramsaur
Jimmie Lynn Ramsaur
Criminal Chief
110 Ninth Avenue South, Suite A-961
Nashville, Tennessee 37203-3870
Telephone: (615) 736-5151

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served electronically on Tor Ekeland and Frederick B. Jennings, attorneys for defendant, on this, the 7th day of October, 2015.

s/ Lynne T. Ingram
Lynne T. Ingram

36